ACCEPTED
03-17-00534-CV
21540047
THIRD COURT OF APPEALS
AUSTIN, TEXAS
1/1/2018 3:21 PM
JEFFREY D. KYLE
CLERK

**NO. 03-17-00534-CV**

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
1/2/2018 8:00:00 AM
JEFFREY D. KYLE
Clerk

DENISE STROUP, AS LEGAL GUARDIAN OF D.L.S.,
AN INCAPACITATED PERSON

*Appellant,*

VS.

MRM MANAGEMENT, INC.

*Appellee.*

On Appeal from the 53RD District Court of Travis County, Texas
No. D-1-GN-17-003290
Honorable Karin Crump

**BRIEF OF APPELLANT**

APPELLANT RESPECTFULLY REQUESTS ORAL ARGUMENT

FOGELMAN & VON FLATERN, LLP
Aaron von Flatern
State Bar No. 24076892
3101 Bee Cave Road, Suite 270
Austin, Texas 78746
(512) 375-3198
(512) 372-3209 (telecopier)
aaron@fvlawfirm.com

COUNSEL FOR APPELLANT

## LIST OF PARTIES AND COUNSEL

Pursuant to Rule 38.2(a)(1)(A), the following is a list of parties and counsel before the Court.

**Appellant:**

Sarah Denise Stroup as legal guardian of D.L.S., an incapacitated person………………………………………………………………….Plaintiff

**Counsel for Appellant:**

Aaron von Flatern......................................................Trial/Appellate Counsel
State Bar No. 24076892
Fogelman & Von Flatern, LLP
3101 Bee Cave Road, Suite 100
Austin, Texas 78746
(512) 375-3198
(512) 372-3209 (telecopier)
aaron@fvlawfirm.com

**Appellee:**

MRM Management, Inc..……………………………………......Defendant

**Counsel for Appellee:**

Gregory R. Ave.....................................................Appellate Counsel
State Bar No. 01448900
Walters, Balido & Crain, LLP
Meadow Park Tower, Suite 1500
10440 North Central Expressway
Dallas, Texas 75231
(214) 347-8310
(214) 347-8311 (telecopier)
AveEdocsNotifications@wbclawfirm.com

# TABLE OF CONTENTS

LIST OF PARTIES AND COUNSEL..............................................................i

TABLE OF CONTENTS...........................................................................ii

INDEX OF AUTHORITIES.......................................................................v

STATEMENT OF THE CASE.....................................................................1

ISSUES PRESENTED...............................................................................4

STATEMENT OF THE FACTS....................................................................4

SUMMARY OF THE ARGUMENT.............................................................6

ARGUMENT............................................................................................8

    A.    Standard of Review....................................................................8

        1.    Traditional Motion for Summary Judgment Review.........8

        2.    No Evidence Motion for Summary Judgment Review......9

        3.    Summary Judgment Review in General..........................10

    B.    The Trial Court Erred in Granting MRM's Traditional Motion for Summary Judgment............................................................11

        1.    Appellee MRM Has Failed to Conclusively Negate Respondeat Superior Liability.........................................11

            a.    The independent contractor agreement cannot override the broker's responsibility under Texas law.................................................................12

b. Because it dissuaded Taylor from purchasing additional insurance, MRM should be estopped from using the independent contractor agreement to escape exposure that Taylor would otherwise have insured…………………………………..................15

c. Fact questions abound in the determination of the independent-contractor question..........................................................17

    i. The independent nature of Taylor's business …………………………………………18

    ii. Taylor's obligation to supply necessary supplies, tools, and materials……………..19

    iii. Taylor's right to control the progress of her work........................................................20

    iv. The actual control exercised by Appellee MRM........................................................21

    v. The permanency of the working relationship ……………………………………..……..23

    vi. Whether the parties believe they are creating an employer-employee relationship...........23

    vii. The time for which Taylor was employed...24

    viii. The method by which Taylor was paid......24

2. Appellee MRM Has Failed to Conclusively Negate Joint-Enterprise Liability.......................................................24

3. Appellee MRM Has Failed to Conclusively Negate Liability Under the Texas Occupations Code ................28

       4.     Texas Labor Code Jurisprudence Is Persuasive In Favor of 'Course and Scope' Versus 'Detour' for Each of Appellant's Theories of Recovery.....................................35

            a.     The dual purpose rule.............................................35

            b.     The continuous coverage doctrine.........................36

   C.     The Trial Court Erred in Granting MRM's No Evidence Motion for Summary Judgment..............................................................38

PRAYER.................................................................................................................39

CERTIFICATE OF SERVICE.................................................................................40

CERTIFICATE OF COMPLIANCE........................................................................41

# INDEX OF AUTHORITIES

**Cases**

*Aetna Cas. & Sur. Co. v. Orgon*,
721 S.W.2d 572 (Tex. App.—Austin 1986, writ ref'd n.r.e.)………......................37

*Aluminum Chemicals, Inc. v. Bechtel Corp.*,
28 S.W.3d 64 (Tex. App.—2000, no pet.)…………….......................................25

*Arbelaez v. Just Brakes Corp.*,
149 S.W.3d 717 (Tex. App.–Austin 2004, no pet.)..............................................37, 38

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005)..................................................................................10

*Denson v. Dallas County Credit Union*,
262 S.W.3d 846 (Tex. App.—Dallas 2008, no pet.)………....................................9

*Flood v. Katz*,
294 S.W.3d 756 (Tex. App.—Dallas 2009, pet. denied) ...........................................9

*Gipson v. Davis Realty Co.*,
215 Cal. App. 2d 190 (1963).....................................................................14, 30

*Home Interiors & Gifts, Inc. v. Veliz*,
695 S.W.2d 35 (Tex. App.—Corpus Christi 1985, writ ref. n.r.e.)..........................18

*Kindred v. Con/Chem, Inc.*,
650 S.W.2d 61 (Tex. 1983)..................................................................................10

*King Ranch, Inc. v. Chapman*,
118 S.W.3d 742 (Tex. 2003)...................................................................................9

*Merrell Dow Pharms., Inc. v. Havner*,
953 S.W.2d 706 (Tex. 1997) ………….....................................................................9

*Nixon v. Mr. Prop. Mgmt. Co.*,
690 S.W.2d 546 (Tex. 1985)..............................................................................8, 10

*Pitchfork Land and Cattle Co. v. King*,
346 S.W.2d 598 (Tex. 1961)..............................................................................11, 18

*Saenz. v. Southern Union Gas Co.*,
999 S.W.2d 490 (Tex. App.—El Paso 1999, no pet.)..............................................10

*Shelton v. Standard Ins. Co.*,
389 S.W.2d 290 (Tex. 1965)..................................................................................37

*Sudan v. Sudan*,
199 S.W.3d 291 (Tex. 2006)..................................................................................10

*Texas DOT v. Able*,
35 S.W.3d 608 (Tex. 2000)....................................................................................25

*Tex. Mut. Ins. Co. v. Jerrols*,
385 S.W.3d 619 (Tex. App.—Houston [14th Dist.] 2012, pet. dism'd)..............35, 36

*Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*,
644 S.W.2d 443 (Tex. 1982)…................................................................................9

*Wornick Co. v. Casas*,
856 S.W.2d 732 (Tex. 1993)....................................................................................8

*Zurich Am. Ins. Co. v. McVey*,
339 S.W.3d 724 (Tex. App.—Austin 2011, pet. denied)....................................35, 36

**Statutes**

Tex. Occ. Code § 1101.001...........................................................................12, 28, 29

Tex. Occ. Code § 1101.002…........................................................12, 13, 29, 31, 34

Tex. Occ. Code § 1101.351................................................................12, 13, 18, 29

Tex. Occ. Code § 1101.803......................................................12, 14, 17, 29, 30

**Rules**

Tex. R. Civ. P. 166a(i) ....................................................................9, 10

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS
AUSTIN, TEXAS

DENISE STROUP, AS LEGAL GUARDIAN OF D.L.S.,
AN INCAPACITATED PERSON

*Appellant,*

VS.

MRM MANAGEMENT, INC.

*Appellee.*

On Appeal from the 53RD District Court of Travis County, Texas
No. D-1-GN-17-003290
Honorable Karin Crump

**BRIEF OF APPELLANT**

TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:

Appellant Denise Stroup respectfully presents this Brief of Appellant.
Appellant requests that this Court reverse the judgment of the 53rd District Court of
Travis County, Texas, and in support thereof would show the Court as follows:

STATEMENT OF THE CASE

This is an appeal from summary judgment in a personal injury car-crash case.
It should be noted that the sole injured party in the case—Douglas Lee Stroup a/k/a

1

D.L.S—became incapacitated as a result of his injuries. He was therefore represented in the proceedings below by his legally appointed guardian, Sarah Denise Stroup a/k/a Denise Stroup (hereafter "Stroup", "Appellant", "Appellant Stroup", or "Plaintiff below"). Supp CR 4. On July 27, 2017, by order of the Probate Court No. 1 of Travis County, Douglas Lee Stroup's rights were restored, and the guardianship discharged.

The procedural history is as follows. Appellant Stroup sued a real estate agent named Penny Harrington Taylor alleging negligent operation of a motor vehicle. Supp. CR 4-8; Supp. CR 118-124. Stroup additionally sued the corresponding real estate broker of record, MRM Management, Inc. (the Appellee in this proceeding) alleging MRM Management, Inc. was vicariously liable for the tortious conduct of Penny Harrington Taylor. Supp. CR 4-8; Supp. CR 118-124. MRM Management, Inc. will be referred to herein as "MRM", "Appellee", or "Appellee MRM".

Appellee MRM filed a combined Traditional and No-Evidence Motion for Summary Judgment. As grounds for summary judgment, Appellee MRM asserted there was no evidence to support any of Stroup's theories of vicarious liability, and/or that the summary judgment evidence conclusively negated Stroup's theories of vicarious liability as to MRM.

In its motion, Appellee MRM did not challenge Stroup's underlying claims of negligence as to Defendant Taylor, or assert any grounds with respect to Taylor's conduct—only the existence of Defendant MRM's vicarious liability for Taylor's conduct.

The order granting MRM Management, Inc.'s First Amended Traditional and No Evidence Motions for Summary Judgment was signed on February 28th, 2017 in Travis County Cause No. D-1-GN-15-004909. Supp. CR 407. That case was styled *Sarah Denise Stroup, as Legal Guardian of Douglas Lee Stroup, an Incapacitated Person v. Penny Harrington Taylor and MRM Management, Inc.* in the 98th Judicial District Court of Travis County, Texas. Supp. CR 407.

By order of that Court, Stroup's claims against MRM Management, Inc. were subsequently severed on July 17, 2017 to a new cause—Cause No. D-1-GN-17003290, styled *Douglas Lee Stroup v. MRM Management, Inc.* in the 53rd Judicial District Court of Travis County, Texas. Supp CR 435-36. Accordingly, on July 17, 2017 the prior order granting Summary Judgment as to defendant MRM Management, Inc., became final as it disposed of all claims and parties within cause number D-1-GN-17-003290.

Stroup timely filed notice of appeal on August 10, 2017 in Cause No. D-1-GN-17-003290. Supp. CR 8-9.

3

## ISSUES PRESENTED

The sole issue on appeal in this case is whether the trial court's order granting summary judgment in favor of MRM was proper. That is: has Stroup presented evidence raising a genuine issue of material fact as to each element of Stroup's vicarious-liability theories of recovery against MRM, including: respondeat superior; joint-venture liability; and statutory vicarious liability?

A key sub-issue is whether the Texas Real Estate License Act (within the Texas Occupations Code) requires real estate brokers to be responsible for the tortious conduct of real estate agents, regardless of the agents' status as employees or independent contractors.

## SUMMARY OF THE FACTS

This is a personal injury case arising from a car-versus-motorcycle crash. According to the police report, on August 6, 2015, in Austin, Texas, Penny Harrington Taylor (hereafter "Taylor" or "Defendant Taylor"), caused a collision when she advanced her car into a public roadway from a hotel driveway. Supp. CR 347-348. Defendant Taylor was a licensed realtor at the time and Appellee MRM was her sponsoring broker for that license. Supp. CR 350. Taylor testified that she believes she was engaged in selling real estate at the time of the subject crash. Supp. CR 329 (76:21-24). Taylor had traveled to east Austin that Thursday morning from

4

Lakeway, Texas with the intent of devoting the weekend to performing landscape improvement work on a residential property that she was listing for sale at 2705 Crest Avenue, in Austin, Texas. Supp. CR 318 (59:3-9); Supp. CR 161 (69:14-21). The listing agreement for 2705 Crest Avenue designates Taylor as the listing agent, and Keller Williams Realty (trade name for Appellee MRM Management, Inc.) as the broker of record. *See* Appendix Ch. 1; *see also* Supp. CR 352-360; *see also* Supp. CR 267 (establishing Keller Williams Realty as the trade name for MRM Management, Inc.).

In the proceeding below, Appellant Stroup sued Penny Harrington Taylor (hereafter "Defendant Taylor") for negligently causing the motor vehicle crash. Supp. CR 4-8; Supp. CR 118-124. Because Stroup alleged Defendant Taylor was a licensed real estate salesperson engaged in real estate sales activities at the time of the crash, Stroup additionally sued the real estate broker of record, Appellee MRM, alleging that MRM was vicariously liable for Defendant Taylor's tortious conduct. Supp CR 4-8; Supp. CR 118-124. Stroup alleged that MRM was vicariously liable pursuant to one or more of the following theories: respondeat superior; principle-agent liability; joint enterprise liability; and statutory vicarious liability pursuant to the Texas Real Estate License Act within the Texas Occupations Code. Supp. CR 118-124.

Appellee MRM's Traditional and No-evidence Motion for Summary Judgment asserted there was no evidence to support any of Stroup's theories of vicarious liability, and/or that its summary judgment evidence conclusively negated Stroup's theories of vicarious liability as to MRM.

## SUMMARY OF THE ARGUMENT

The Trial Court erred in granting MRM Management, Inc.'s Traditional Motion for Summary Judgment. Appellee has failed to conclusively negate respondeat superior liability for Appellant's tort claims against Appellee's employee Penny Taylor. Appellee argues Taylor was an independent contractor to whom respondeat superior could not apply. However, because Taylor was a real estate agent, and Appellee was Taylor's real estate broker of record, the independent contractor agreement presented by Appellee cannot override Texas law requiring MRM to be responsible for Defendant Taylor's conduct. Further, because the wording of the agreement dissuaded Taylor from purchasing additional insurance, MRM should be estopped from using the independent contractor agreement to escape exposure that Taylor would otherwise have insured. Further, fact questions abound in this case when weighing the independent-contractor-versus-employee factors established by the Texas Supreme Court. Factors with fact questions include: the independent nature of Taylor's business; Taylor's obligation to supply necessary

6

supplies, tools, and materials; Taylor's right to control the progress of her work; the actual control exercised by Appellee MRM; the permanency of the working relationship; whether the parties believe they created an employer-employee relationship; the time for which Taylor was employed; and the method by which Taylor was paid.

In addition to respondeat superior liability, Appellee MRM has failed to conclusively negate joint-enterprise liability. Appellee argues there was no evidence of the element of equal right of control, and that Taylor was outside the scope of any alleged joint-enterprise. However, substantial evidence suggests MRM's real estate agents participated in the governance of the organization, and that Taylor was within the scope of her work for the organization when the crash occurred. The course-and-scope evidence applies not only to the joint-enterprise theory of recovery, but also to the respondeat superior theory of recovery, and the statutory vicarious liability theory of recovery.

Appellee MRM has failed to conclusively negate vicarious liability under the Texas Occupations Code, which requires real estate brokers to answer for the tortious conduct of the real estate agents who carry out the broker's business.

Finally, the trial court erred in granting MRM's no-evidence motion for summary judgment. Because MRM has only challenged its vicarious liability for

Taylor's conduct, and not the elements of Plaintiff's tort claims against Taylor, the fact issues established in response to Appelle's Traditional Motion are equally responsive to the no-evidence motion. Appellant has presented more than a scintilla of evidence as to Appellee MRM's right of control as an employer, vicarious liability as a joint-venturer, and statutory responsibility as a sponsoring broker. Further, Appellant has presented more than a scintilla of evidence as to Taylor's acting within the course and scope of the relevant work under the doctrines of respondeat superior, joint-enterprise, and statutory vicarious liability.

## ARGUMENT

### A.     Standard of Review

#### 1.     *Traditional Motion for Summary Judgment Review*

The standard for reviewing a traditional summary judgment is well established. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985). Defendants who move for traditional summary judgment must show the plaintiff has no cause of action. *See Id.* Defendant (here, the Appellee MRM) may meet this burden by either disproving at least one essential element of each theory of recovery, or by conclusively proving all elements of an affirmative defense. *Wornick Co. v. Casas*, 856 S.W.2d 732, 733 (Tex. 1993).

A matter is conclusively established if ordinary minds cannot differ as to the

conclusion to be drawn from the evidence. *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443, 446 (Tex. 1982). After the movants have established a right to summary judgment, the burden shifts to the nonmovants to present evidence creating a fact issue. *Denson v. Dallas County Credit Union*, 262 S.W.3d 846, 849 (Tex. App.--Dallas 2008, no pet.).

### 2.    *No Evidence Summary Judgment Review*

The standard for reviewing a no-evidence summary judgment is the same legal sufficiency standard used to review a directed verdict. *See* Tex. R. Civ. P. 166a(i); *Flood v. Katz*, 294 S.W.3d 756, 762 (Tex. App.—Dallas 2009, pet. denied). Accordingly, this Court must determine whether the nonmovant—here, the Appellant--produced more than a scintilla of probative evidence to raise a fact issue on the material questions presented. *See Flood*, 294 S.W.3d at 762.

A no-evidence summary judgment is improperly granted if the respondent—here, the Appellant—has brought forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions." *Id.* (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "Less than a scintilla of evidence exists when the evidence is 'so

9

weak as to do no more than create a mere surmise or suspicion' of a fact." *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

Appellant–as non-movant responding to a no-evidence motion for summary judgment–is not required to have marshalled her proof, but need only have pointed out evidence that raises a fact question on the challenged elements. *See Saenz. v. Southern Union Gas Co.*, 999 S.W.2d 490, 493-94 (Tex. App.–El Paso 1999, no pet.); *see also* Comments to Tex. R. Civ. P. 166a(i).

### 3. *Summary Judgment review in general*

In deciding or reviewing either a traditional or no-evidence motion for summary judgment, every reasonable inference must be indulged in favor of the non-movant, and any doubts resolved in the non-movant's favor. *See Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex. 1985); *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006) (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005)).

Thus, the Appellant should prevail in this case on both the traditional motion for summary judgment and the no-evidence motion for summary judgment if the summary judgment evidence contains more than a scintilla of evidence to raise a genuine issue of material fact for each of the challenged theories of recovery.

**B.** **The Trial Court Erred in Granting MJM's Traditional Motion for Summary Judgment**

Appellee MRM's summary judgment evidence failed to conclusively negate vicarious liability under any of the Appellant Stroup's theories of recovery, including respondeat superior, joint enterprise, and statutory liability. The summary judgement evidence raised, at a minimum, a genuine issue of material fact as to each theory. Therefore, the trial court erred in granting Appellee MRM's traditional motion for summary judgment.

**1.** **Appellee MRM has failed to conclusively negate respondeat superior liability**

Appellee MRM's Traditional Motion for Summary Judgment argued that the summary judgment evidence conclusively established that Defendant Taylor was an independent contractor, and thus not MRM's employee. Supp. CR 206-207. In support of this proposition, Appellee MRM points to an independent contractor agreement that Taylor signed, and further argued that the Court should apply a multi-factored test pursuant to, *inter alia*, *Pitchfork Land & Cattle v. King*. Supp. CR 206; *See Pitchfork Land and Cattle Co. v. King*, 346 S.W.2d 598, 602-03 (Tex. 1961)**;** *see also* Appendix Ch. 2 (independent contractor agreement).

Plaintiff would show that the independent contractor agreement is void to the extent it conflicts with the Texas Occupation Code's statutory mandate that real

estate brokers answer for their salespersons' tortious conduct.

Additionally, Plaintiff will show that Defendant MRM should be estopped from using the independent contractor agreement to shield itself from liability that the agreement itself places at the feet of Defendant MRM.

Finally, even assuming the multifactored *Pitchfork* test were the only consideration for the question of respondeat superior liability, the summary judgment evidence presents genuine issues of material fact within the application of that test.

### a. The independent contractor agreement cannot override the broker's responsibility under Texas law

MRM's main argument against respondeat superior liability is the independent contractor agreement that Defendant Taylor signed. However, the independent contractor agreement is void to the extent it conflicts with the Texas Occupation Code's statutory mandate that real estate brokers answer for their salespersons' tortious conduct.

Chapter 1101 of the Texas Occupations Code is known as the Texas Real Estate License Act (hereafter "the Act"). *See* Tex. Occ. Code § 1101 et seq.; *See also* Appendix Ch. 3. The Act sets forth the authority, professional standards, and licensure requirements for persons and entities engaged in real estate transactions in

Texas, including real estate "brokers" and "salespersons". *Id*.[1] In general terms, the Act defines "brokers" as persons who are paid to perform certain acts (referred to herein as "broker acts") for others. *See* Tex. Occ. Code § 1101.002(1). Those broker acts are presented within a statutory laundry list that covers virtually all of the things the general public would commonly understand to be the job of a "realtor" including: buying and selling real estate; listing real estate; locating real estate; procuring prospects to accomplish the sale of real estate; and promoting the sale of real estate. *Id.*

The Act defines a "salesperson" as a person who is sponsored by a licensed broker for the purpose of performing the above [broker] acts. *See* Tex. Occ. Code § 1101.002(7). Further, the Act states that "[a] licensed salesperson may not engage or attempt to engage in real estate brokerage unless the sales agent is sponsored by a licensed broker *and is acting for that broker*. Tex. Occ. Code § 1101.351(c) (emphasis added).

In other words, all aspects of all real estate transactions in Texas are technically carried out by real estate brokers, or by salespersons who are authorized to engage in real estate brokerage for their sponsoring broker on the brokers'

---

1 The Occupations Code was revised effective January 1, 2016 (after the subject crash). Under the revision, the term "salesperson" was changed to "sales agent". The code provisions cited herein were otherwise unchanged.

behalves. As such, the Act establishes a master-servant relationship as a matter of law, and assigns legal responsibility for all statutory broker acts to the brokers. Section 1101.803 of the Act states "[a] licensed broker is liable to the commission, *the public*, and the broker's clients for any conduct engaged in under this chapter by the broker *or by a salesperson associated with or acting for the broker*. Tex. Occ. Code § 1101.803 (emphasis added).

The Act contains no provision authorizing brokers to contractually assign that responsibility back to the salespersons, and thus brokers like Defendant MRM have a non-delegable duty to the public for the conduct of salespersons associated with Defendant MRM.

Therefore, any agreement that purports to characterize a salesperson's relationship to her sponsoring broker as that of an independent contractor is simply void and unenforceable for the purposes of vicarious liability. Although Plaintiff could locate no cases in which such a contract has been deemed void in Texas, Plaintiff would point the court to persuasive authority in California, where a similar statute was construed to void a realtor's independent contractor agreement with his sponsoring broker. *See Gipson v. Davis Realty Co.*, 215 Cal. App. 2d 190 (1963)**;** *See* Appendix Ch. 3.

Because Defendant MRM's traditional motion for summary judgment relative to the theory of respondeat superior is entirely predicated on the argument that Defendant Taylor should be characterized as an independent contractor, and because that characterization is statutorily prohibited, Defendant MRM's motion should be denied.

> **b.** **Because it dissuaded Taylor from purchasing additional insurance, MRM should be estopped from using the independent contractor agreement to escape exposure that Taylor would otherwise have insured**

Even if the independent contractor agreement cited by Appellee MRM were deemed enforceable, the agreement on its face implies that MRM will accept a large share of liability for Defendant Taylor's conduct. Supp. CR 267-273; *See* Appendix Ch. 4. Because the misleading document dissuaded Defendant Taylor from purchasing additional insurance, or from investigating the need for same, MRM should be estopped from using the independent contractor agreement to shield itself from the exposure presented by Appellant's claims. *Id.*

Section D within page 4 of the subject agreement states that "for risks…arising from Agent's negligent…breach of any law, regulation, or standard of conduct that applies to Agent's actions or activities as a licensed real estate sales associate, Agent agrees to indemnify and hold [Appelle MRM] harmless from and

against that *percentage* of Liability that equals the percentage of commissions payable to the Agent on the date of the incident or omission that gave rise to the Liability occurred." *Id* (emphasis added). Section B goes on within that same page to define "Liability" to mean "all liability, claims, damages, losses, costs and expenses that a party sustains or incurs as a result of or in connection with a particular incident or situation". *Id.* Thus, for "[all] damages", "[all] claims", and "[all] losses that a party sustains" MRM only requires its agents to indemnify MRM or hold MRM harmless from a (capped) portion of MRM's liability. See *Id.*

This reads like a co-insurance requirement. One can imagine Dominos Pizza telling its delivery drivers: "If you cause a crash, you must forfeit a portion of your delivery tip to cover Dominos' exposure". Most delivery drivers would take that to mean Dominoes was assuming responsibility for the rest of the exposure, or that Dominos anticipated it would be vicariously liable for the driver's conduct. The same applies here, especially when viewed within the totality of the circumstances of MRM's sponsorship of Taylor's license, including:

> (1) MRM's requirement that Taylor insure her car to a certain level, and to have (MRM's trade name) Keller Williams named as an additional insured; CR 375 (59:4-8); and

16

(2) the express vicarious liability requirement stated in the Texas Real Estate License Act through which Taylor obtained her license. *See* Tex. Occ. Code § 1101.803 (stating "[a] licensed broker is liable to… the public… for any conduct engaged in under this chapter by… a salesperson associated with or acting for the broker).

The clear implication of this agreement is that MRM anticipated its own liability for losses arising from the agent's negligence, and viewed that risk as a routine part of its business. It only asked the agent to cover a portion of the MRM exposure. Under the agreement, the agent's percentage of responsibility for "all claims" against MRM could never exceed the commission that she earned on the day of the subject negligence. *See* Supp. CR 267-273; *see* Appendix Ch. 4.

To the extent Defendant Taylor was consciously or subconsciously mislead by this agreement, and otherwise might have secured additional liability insurance for herself, Defendant MRM should be estopped from using the agreement to shield itself from the master-servant liability that the agreement implies is MRM's.

### c. *Fact questions abound in the determination of the independent-contractor question*

Even if the Court finds the Occupations Code inapplicable, the question of whether Defendant Taylor was an employee or independent contractor, is a factually

17

intense, multi-factored inquiry. Appellee's MRM's evidence fails to conclusively establish that Defendant Taylor was an independent contractor under the "*Pitchfork*" factors urged by MRM. Those factors are: (1) the independent nature of the contractor's business; (2) the contractor's obligation to supply necessary supplies, tools, and materials; (3) the contractor's right to control the progress of the work; (4) the actual control exercised by the employer; (5) the permanency of the work relationship; (6) whether the parties believe they are creating an employer-employee relationship; (7) the time for which she is employed; and (8) the method by which she is paid. *See Pitchfork Land and Cattle Co. v. King*, 346 S.W.2d 598, 602-03 (Tex. 1961); *see also Home Interiors & Gifts, Inc. v. Veliz*, 695 S.W.2d 35, 41 (Tex. App.-Corpus Christi 1985, writ ref. n.r.e.).

Appellant would show the court the following genuine issues of material fact concerning those same factors:

### i. The independent nature of Taylor's business

Texas law prohibits Defendant Taylor from engaging in any real estate business without Appellee MRM's sponsoring brokerage. Further, all of Defendant Taylor's real estate related activities would be illegal "unless [she] is sponsored by a licensed broker *and is acting for that broker*." *See* Tex. Occ. Code § 1101.351(c)

18

(emphasis added); *See also* above Section B(1)(a) of Appellant's Brief, describing the linkage between real estate salespersons and brokers created by the Texas Real Estate License Act, and fact that virtually all known real estate related activities are legally the actions of real estate brokers like MRM. Therefore, the nature of Defendant Taylor's real estate business is to be completely dependent upon Appellee MRM's sponsoring brokerage.

### ii. Taylor's obligation to supply necessary supplies, tools, and materials

Appellee MRM supplied Taylor with a business card (showing Appellee's MRM's trade name Keller Williams, and describing her as a Keller Williams "Real Estate Agent"). Supp. CR 337. Defendant MRM supplied training, including a dedicated training agent and training book, software training, a website containing training materials, videos, forms, calculators, and kits. Supp. CR 306-11 (17:13-18:12;19:16-19;23:7-24:7). Defendant MRM also supplied software for electronically managing Taylor's real estate transactions. Supp. CR 308-09 (19:16-20:3). Defendant MRM also supplied packets and checklists to realtors like Taylor to guide them through, e.g., the listing process and open houses. Supp. CR 373-74 (57:8-58:6).

### iii. Taylor's right to control the progress of her work

Most employees who are licensed professionals, whether realtors, engineers, attorneys, or insurance adjusters, are likely to enjoy a high level of autonomy even while remaining subject to their employer's right of control. As such, it is no surprise that Defendant Taylor was empowered to manage her real estate transactions with a high degree of professional independence. It is telling, however, that Appellee MRM nonetheless subjected her to a number of policies and procedural requirements, the violation of which could be considered a "fire-able offense." Supp. CR 375 (59:4-10). Many of those policies are contained in the Keller Williams Policies and Guidelines manual, excerpts from which are attached hereto See Supp. CR 379-93; Appendix Ch. 5. That document, on page 1-1, starts off with a dramatic, if vague, definition of "interdependence", which quotes Stephen Covey to directly refute the concept of "independence" in favor of the more magical paradigm of "interdependence". *See Id.* That interdependence is evident from the numerous ways that Defendant MRM exercised control over Taylor including:

- Requiring Taylor to insure her car to a certain level, and to have Keller Williams named as an additional insured. Defendant Taylor; Supp. CR 375 (59:4-8).

20

- Requiring Taylor to keep her car clean (this one is particularly relevant in this case as Ms. Taylor was—in addition to conducting other real estate business—looking for a car wash at the time of the subject crash); Supp. CR 333 (101:7-24); See also Supp. CR 389 ¶ 1-2; See generally Supp. CR 267-273 and specifically Supp. CR 267 ¶ 3.

- Creating "standards" that Appellee MRM alleges Taylor violated including the standard of turning in listing agreements within 3 days of execution, refraining from performing manual labor on real property, and refraining from hiring contractors to perform work. Supp. CR 368-72 (49:22-52:3).

### iv. The actual control exercised by Defendant MRM

As partly-described in the preceding section, Defendant MRM exercised control over its agents by contractually binding them to follow the aforementioned 100-plus page Policies and Guidelines manual. Supp. CR 333 (101:7-24); *see generally* Supp. CR 267-273 and *specifically* CR 267 ¶ 3; *see also* Appendix Ch. 5. This was not just a handout, but something the agents had to agree in writing to follow. *Id.* Within the manual, control is exerted in the form of, e.g., section "4.9.1.12 Conduct" which governs alcohol consumption, conduct at the market

21

center, and cooperation with other brokers. Supp. CR 366-67 (16:17-17:2); Appendix Ch. 5. Likewise, the preceding section of this brief gives examples of policies within the manual concerning the maintenance of a certain level of automobile insurance covering MRM, and the need for agents to keep their cars clean. The manual further instructs Taylor to, e.g., contact her sellers at least once per week. *See* Supp. CR 390 ¶ 5 (Section 4.9.1.20.2). Further, in Section 4.9.1.20.3, the manual instructs Taylor to maintain complete and accurate records, and, in clear employer-speak, admonishes Taylor in bold letters that "**there is no excuse for the violation of this guideline by any associate**". See Supp. CR 390 ¶ 6 (Section 4.9.1.20.3).

Oddly, that bold admonition uses the watered-down term "guideline" instead of the stronger, more accurate term "policy." This is a transparent attempt by Appellee MRM to enjoy absolute control without having to be responsible for that control. This theme is repeated in Appellee MRM's corporate representative Jessica Tenant's deposition. Although her lawyers sent requests for admissions to Defendant Taylor asking Taylor to admit that "Keller Williams associates should not perform repair work for listed properties", Ms. Tenant testified that that is "not a demand", but rather "a professional standards suggestion." Supp. CR 369-71 (50:13-52:1); Supp. CR 395-399. Likewise, when she was asked about her lawyers' request that

22

Defendant Taylor admit that Taylor was not allowed to hire contractors without Keller Williams' [MRM's] express consent, Ms. Tenant backtracked and said that there actually is no written policy on that, but that Defendant Taylor should have talked to [Appellee MRM] about it. *Id.*

Such vagueness should not benefit the party who created it, especially in the context of summary judgment.

### v. *The permanency of the working relationship*

Defendant Taylor's real estate license has been solely sponsored by Appellee MRM for nearly 10 years. Supp. CR 303-04 (6:7-7:18).

### vi. *Whether the parties believe they are creating an employer-employee relationship*

As pointed out in Appellee's Motion for Summary Judgment, Defendant Taylor has stated she believes she was an independent contractor. Supp. CR 211 ¶ 1. However, she is also a lay witness. She has no reason to doubt the force and effect of the independent contractor agreement she was made to sign when she joined MRM. As above, Appellant Stroup maintains that the agreement is misleading and void. Moreover, to the extent Taylor's subjective belief about her employment status was misinformed by Appellee MRM, her subjective belief should be given little if any weight.

23

### vii. *The time for which Taylor was employed*

As above, Defendant Taylor's real estate license has been solely sponsored by Appellee MRM for nearly 10 years. Supp. CR 303-04 (6:7-7:18).

### viii. *The method by which Taylor was paid*

All of Taylor's compensation was paid by Appellee MRM (or its dba Keller Williams). Supp. CR 372 (55:4-55:6).

Putting all of the above factors together, it is clear that genuine issues of material fact exist as to whether Defendant Taylor was an independent contractor or an employee. The trial court therefore erred in granting Appellee MRM's traditional motion for summary judgment.

### 2. Appellee MRM has failed to conclusively negate joint-enterprise liability

In both its traditional and no evidence motions, Appellee MRM argues there is no evidence supporting the existence, and no fact questions as to the absence of, a joint enterprise through which Appellant Stroup could hold Appellee MRM vicariously liable for Defendant Taylor's actions. Supp. CR 143-44; 213-14.

Appellant Stroup agrees with the elements as stated in Appellee's motion, and that for joint-enterprise liability to attach, Appellant must establish: an agreement; a common purpose; a community of pecuniary interest; and an equal right of control

24

between Defendant Taylor and Appellee MRM. See Supp. CR 143-144; *Texas DOT v. Able*, 35 S.W.3d 608, 613 (Tex. 2000). Appellant also agrees that Appellant must establish that Taylor was acting within the scope of that joint enterprise to hold Appellee MRM vicariously liable. Supp CR 143-144; see also *Aluminum Chemicals, Inc. v. Bechtel Corp.*, 28 S.W.3d 64, 67 (Tex. App.--Texarkana 2000, no pet.)

Appellee MRM has wholly failed to offer evidence conclusively negating any of those elements within its traditional motion for summary judgment. As such the traditional motion for summary judgment should be denied on its face.

Within its no-evidence motion, Appellee MRM did not challenge the elements of agreement, common purpose, or community of pecuniary interest. Instead MRM's no-evidence motion has challenged the elements of (1) equal right of control; and (2) acting in the scope of the joint enterprise. Supp. CR 216-217. As to equal right of control, there is ample evidence, as described above, that Taylor was contractually bound to follow MRM's policies including keeping her car clean, and that she was doing exactly that leading up to the crash. Appellee MRM, who is charged by the Texas Occupations Code with responsibility for the salesperson Taylor's actions, and who promulgated policies for its agents to follow, clearly had the ability and right to tell Taylor what to do in connection with buying and listing real estate. Meanwhile MRM's corporate representative Jessica Tennant has testified

25

that the agent's leadership committee was developed so that agents would "…have a voice in the decision-making and how the office was run…" Supp. CR 371 (52:6-21).

As for the question of scope, there is ample evidence that in a broad sense, Taylor had traveled to east Austin from Lakeway Texas with the intent of devoting the entire weekend of the crash to performing work on the property she was listing at 2705 Crest Avenue. Supp. CR 318 (59:3-9). Taylor was the listing agent, and Keller Williams Realty (trade name for Defendant MRM) was listed as the broker on the listing agreement. Supp. CR 352-360.

The morning of the crash, Defendant Taylor had met with the head landscaping worker, and had driven with him to Home Depot where she purchased supplies including a chainsaw and chainsaw oil for use by the landscapers on the subject house. Supp. CR 319-23 (60:17-61:9:4; 62:24-63:2; 63:19-64:12). The plan was to clear trees to open up the view in order to improve the marketing of the property. Supp. CR 322-23 (63:25-64:12). Taylor went to the hotel to check in with him following the couple's trip to Home Depot. Supp. CR 326 (70:11-22). Given that Ms. Taylor testified that she was having an affair with the landscaper, there is a fact question about whether she would have deviated from her real estate activities at some point for romantic activities before returning to the enterprise of marketing

26

2705 Crest Ave. However, this red-hearing question would exist with any couple who happened to work together. There is absolutely no evidence that the couple in this case did anything but work on the day of the crash.

The summary judgment evidence shows that Taylor went to Home Depot, returned to check in at the hotel with the landscaper (in anticipation of a multiple-day job), dropped her stuff in the room, and was getting ready to return to the worksite at 2705 Crest Avenue. At that point she decided to move her car out of the sun, and in so doing, to peer around for a nearby car wash. Supp. CR 326-28 (70:23-72:3). Importantly, the logical reason for her to move her car out of the sun at that moment was that the couple was about to take the landscaper's truck back to 2705 Crest Ave, leaving her car where it was parked in the August sun. Supp. CR 326 (70:11-71:3). Thus, even if a romantic detour had occurred after the trip to Home Depot (which is contrary to what Taylor testified to), she was at a minimum re-engaging with the enterprise of marketing 2705 Crest Avenue, the property for which she was the contractual listing agent and Appellee MRM was the contractual broker.

The Defendant's suggestion that by looking for a car wash, Taylor somehow deviated from her joint enterprise with MRM—when keeping one's car clean was an express directive from MRM—is clearly well short of conclusive. The fact that

Taylor didn't plan to meet potential buyers that day is also irrelevant given that she agreed in her deposition that the active makeover of the 2705 Crest Ave property presented opportunities to discuss the impending sale with neighbors, who might themselves be interested in selling property that Taylor could list, and which Defendant MRM could make money from. Supp. CR 329-31 (76:21-78:23). Ultimately, Defendant Taylor testified that she believes she was engaged in the selling of real estate at the time of the subject crash. Supp. CR 329 (76:21-24).

**3.      Appellee MRM has failed to conclusively negate liability under the Texas Occupations Code**

Above, in Section B(1)(a) of this Brief, the applicability of the Texas Occupations Code is discussed as a reason for voiding the independent contractor agreement in this case. That information is repeated here for ease of reference and in order to expand the argument.

*Repeated text:*

Chapter 1101 of the Texas Occupations Code is known as the Texas Real Estate License Act (hereafter "the Act"). *See* Tex. Occ. Code § 1101.001. The Act sets forth the authority, professional standards, and licensure requirements for persons and entities engaged in real estate transactions in Texas, including real estate "brokers" and "salespersons". *See* Tex. Occ. Code. § 1101 et seq. In general terms,

28

the Act defines "brokers" as persons who are paid to perform certain acts (referred to herein as "broker acts") for others. *See* Tex. Occ. Code § 1101.002(1). Those broker acts are presented within a statutory laundry list that covers virtually all of the things the general public would commonly understand to be the job of a "realtor" including: buying and selling real estate; listing real estate; locating real estate; procuring prospects to accomplish the sale of real estate; and promoting the sale of real estate. *Id.* The Act defines a "salesperson" as a person who is sponsored by a licensed broker for the purpose of performing the above [broker] acts. *See* Tex. Occ. Code § 1101.002(7). Further, the Act states that "[a] licensed salesperson may not engage or attempt to engage in real estate brokerage unless the sales agent is sponsored by a licensed broker *and is acting for that broker*. Tex. Occ. Code § 1101.351(c) (emphasis added).

In other words, all aspects of all real estate transactions in Texas are technically carried out by real estate brokers, or by salespersons who are authorized to engage in real estate brokerage for their sponsoring broker on the brokers' behalves. As such, the Act establishes a master-servant relationship as a matter of law, and assigns legal responsibility for all statutory broker acts to the brokers. Section 1101.803 of the Act states "[a] licensed broker is liable to the commission, *the public*, and the broker's clients for any conduct engaged in under this chapter by

29

the broker *or by a salesperson associated with or acting for the broker*. Tex. Occ. Code § 1101.803 (emphasis added).

The Act contains no provision authorizing brokers to contractually assign that responsibility back to the salespersons, and thus brokers like Defendant MRM have a non-delegable duty to the public for the conduct of salespersons associated with Defendant MRM.

Consequently, any agreement that purports to characterize a salesperson's relationship to her sponsoring broker as that of an independent contractor is simply void and unenforceable for the purposes of vicarious liability. Although Plaintiff could locate no cases in which such a contract was voided in Texas, Plaintiff would point the court to persuasive authority in California, where a similar statute was construed to void a realtor's independent contractor agreement with his sponsoring broker. *See* Gipson v. Davis Realty Co., 215 Cal. App. 2d 190 (1963)**.** *See* Appendix Ch. 3.

*New text:*

In its traditional and no evidence motion for summary judgment, Appellee MRM asserts that the summary evidence shows Defendant Taylor was not associated with or acting for Appellee MRM at the time of the subject crash; and that there is no evidence Taylor was engaged in one of the acts specified in Section

1101.002(1) of the Texas Occupations Code. Supp. CR 214 ¶ 2; Supp. CR 217 ¶ 3.

Due to the linkage of the law as described above, if Taylor was performing one of the acts described in 1101.002(1), then she automatically had to be doing it *for* Appellee MRM pursuant to Section 1101.351(c). Thus, answering the question of whether she was engaged in an act described by Section 1101.002(1) answers the question of "acting for or associated with."

Section 1101.002(1) provides the following list of acts that the law deems the acts of the broker, whether performed by the broker or by a salesperson associated with the broker, as long as they are performed with the expectation of compensation for another:

> "(A)....
>
> (i)   sells, exchanges, purchases, or leases real estate;
> (ii)  offers to sell, exchange, purchase, or lease real estate;
> (iii) negotiates or attempts to negotiate the listing, sale, exchange, purchase, or lease of real estate;
> (iv)  lists or offers, attempts, or agrees to list real estate for sale, lease, or exchange;
> (v)   auctions or offers, attempts, or agrees to auction real estate;
> (vi)  deals in options on real estate, including a lease to purchase or buying, selling, or offering to buy or sell options on real estate;
> (vii) aids or offers or attempts to aid in locating or obtaining real estate for purchase or lease;
> (viii) procures or assists in procuring a prospect to effect the sale, exchange, or lease of real estate;
> (ix)  procures or assists in procuring property to effect the

31

sale, exchange, or lease <u>of real estate</u>;

(x) controls the acceptance or deposit of rent from a resident of a single-family residential real property unit;

(xi) provides a written analysis, opinion, or conclusion relating to the estimated price of real property if the analysis, opinion, or conclusion:

    (a) is not referred to as an appraisal;

    (b) is provided in the ordinary course of the person's business; and

    (c) is related to the actual or potential management, acquisition, disposition, or encumbrance of an interest in real property; or

(xii) advises or offers advice to an owner of real estate concerning the negotiation or completion of a short sale; and

(B) <u>includes a person who</u>:

    (i) <u>is employed by</u> or for <u>an owner of real estate to sell any portion of the real estate</u>; ..."

*See* Tex. Occ. Code § 1101.002(1) (emphasis added). The underlined portions reflect the sections applicable to Taylor's efforts on the day of the subject crash. As described in detail above, within section B(2) concerning joint-enterprise, Taylor admitted to having an affair with the landscaper. Putting aside the propriety of that relationship from the standpoint of Defendant Taylor's marriage, this was a couple—boyfriend and girlfriend—who were in East Austin to perform landscaping work in service of selling real estate. They spent the entire day oriented towards the marketing 2705 Crest Avenue for Appellee MRM. They were both over an hour from their respective homes in Spicewood and Lakeway, and were facing the

32

prospect of a large multi-day job. They obtained a hotel room to cope with that fact.

Leading up to the crash Taylor and the landscaper's activities could be summarized as:

- they tried to check in at the hotel first thing in the morning, but couldn't get in; Supp. CR 324-326; 328 (67:13-68:13; 70:11-22).

- they took the landscaper's truck to Home Depot to get a chainsaw and other supplies for the job ahead; *Id.*

- they returned to the hotel where they checked in, and set their bags down in the room; *Id.*

- from there, Defendant Taylor went outside to move her car out of the sun. (Note that a jury would be entitled to conclude that Taylor was likely moving her car because she and the landscaper were about to take his truck to the listed property in order to commence work. Rather than a detour, this remains consistent with working on the property. Moving her car was a logical first step in commencing work at the listed property); *Id.* (67:6-12; 70:11-22).

- at some point as she is moving her car, Taylor decides to look to see if a car wash is nearby. (This detour, if it was a detour at all, is incidental and nonetheless consistent with directives from the defendant for

33

agents to keep their car clean); Supp. CR 327 (71:4-22).

- Taylor ends up on the apron of the hotel driveway, peering around for a touchless carwash; *Id.*

- She decides to exit the property and re-enter at the hotel one driveway to the west, rather than reversing within the parking lot; *Id.*

- At that point she negligently pulls directly in front of the Plaintiff's motorcycle, which was traveling eastbound on Oltorf Street, resulting in devastating injuries to Plaintiff. Supp. CR 314-317 (33:18-21; 34:24-36:18); See also police report at Supp. CR 347-48; *See* Appendix Ch.7.

What is clear from these events is that Defendant Taylor was in east Austin from far-off Lakeway because she was generally engaged in "selling real estate" as specified in Section 1101.002(1)(A)(i), and/or she was "offering" to sell real estate under Section 1101.002(1)(A)(ii), and/or she was "listing" real estate under Section 1101.002(1)(A)(iv). She could also be said to be continually engaged in procuring property (she was coming back from getting the chainsaw and other materials) to effectuate the sale of real estate, as specified in Section 1101.002(1)(A)(viii). For all of this, she was at all times employed by the owner of the real estate, Reginald Taylor, to sell the real estate pursuant to Section 1101.002(1)(B)(i). Therefore, Appellee MRM has failed to conclusively negate this theory of liability and Plaintiff

34

is entitled to trial on the merits.

**4. Texas Labor Code jurisprudence is persuasive in favor of 'course and scope' versus 'detour' for each of Appellant's theories of recovery.**

Plaintiff has located no direct case law to guide the Court as to the 'detour' boundaries of "course and scope" within the context of the Texas Real Estate License Act, or joint-enterprise liability. However, Texas Courts have long analyzed questions arising from worker "detours", "special missions", and "dual purpose travel" within the context of the Texas Labor Code. Those cases are persuasive to the extent they address Texas public policy questions about who should bear risks that arise from business activity in Texas. See e.g., *Tex. Mut. Ins. Co. v. Jerrols*, 385 S.W.3d 619 (Tex. App.—Houston [14th Dist.] 2012, pet. dism'd); *Zurich Am. Ins. Co. v. McVey*, 339 S.W.3d 724 (Tex. App.—Austin 2011, pet. denied).

**a. The dual purpose rule**

Texas Courts have followed the "dual purpose rule", which holds that dual-purpose travel (combined personal and business travel) is within the course and scope of employment if: (1) the travel to the place of occurrence, here Lakeway to east Austin, or even Home Depot to the La Quinta hotel, or even Taylor's initial parking spot to the crash location, would have occurred even if no personal or private affairs were furthered by the travel; and (2) the travel would not have occurred had

35

there not been affairs of the business to be furthered by the travel. See *Tex. Mut. Ins. Co. v. Jerrols*, 385 S.W.3d 619, 625 (Tex. App.—Houston [14th Dist.] 2012, pet. dism'd)

If such a rule were followed here, the fact of Defendant Taylor's affair with the landscaper would be inconsequential in view of the fact that Taylor's presence in east Austin that day would have occurred even if she selected a different landscaper to complete the work, and would not have occurred but for the business interests that were furthered in improving a property that was listed for sale by Defendant Taylor and Appellee MRM. Likewise, Taylor moving her car out of the sun in preparation for taking the landscaper's truck from the hotel to the jobsite was part of the job. Likewise, Taylor taking the opportunity to peer around for car washes while moving her car, does not rise to the level of a distinct personal errand that would remove her from the course and scope of her employment (or joint enterprise activities, or real estate activities), especially in view of MRM's directive requiring agents like Taylor to keep their cars clean as a part of their work.

### b. The continuous coverage doctrine

This Court's own Labor Code jurisprudence has repeatedly affirmed the "continuous coverage" doctrine for out-of-town business travel. "An employee is generally within the course and scope of his employment when the employer's

business requires him to travel away from the employer's premises." *Zurich Am. Ins. Co. v. McVey*, 339 S.W.3d 724, 731 (Tex. App.—Austin 2011, pet. denied)(*citing Shelton v. Standard Ins. Co.*, 389 S.W.2d 290, 293-94 (Tex. 1965); *Aetna Cas. & Sur. Co. v. Orgon*, 721 S.W.2d 572, 574-75 (Tex. App.—Austin 1986, writ ref'd n.r.e.).

"In fact, relying on what has come to be known as the "continuous coverage" rule, the supreme court and this Court have both held that the course and scope of employment in cases of overnight travel is broad, extending even beyond the actual act of travel itself to include injuries sustained during 'down time.'" *Id.* (citing *Shelton*, 389 S.W.2d at 293-94 (employee injured crossing street from hotel to restaurant was in course and scope); *Orgon*, 721 S.W.2d at 575 (employee injured by broken glass in hotel was in course and scope).

As such, if this were a workers' compensation case, it is clear that Texas law would allocate the risk of injury to the business whose interest was furthered by Taylor's travel to east Austin from Lakeway—in this case Appellee MRM.

In any case, this Court has previously instructed that that, generally speaking, "[c]ourse and scope of employment is . . . a fact issue like negligence or proximate cause." *Arbelaez v. Just Brakes Corp.*, 149 S.W.3d 717, 720 (Tex. App. – Austin 2004, no pet.).

37

In sum, there are, at a minimum, genuine issues of material fact as to whether Taylor was performing an act that would bring her within the scope of the Texas Occupations Code's requirement that real estate brokers like MRM answer for the tortious conduct of their salespersons. The same is true for respondeat superior liability, and joint-enterprise liability.

## C. The Trial Court Erred in Granting MRM's No Evidence Motion for Summary Judgment

Because Appellee MRM's traditional motion for summary judgment concerns the same theories of liability attacked in its no evidence motion for summary judgement, Plaintiff's above responses to Appellee MRM's traditional motion are already responsive to Appellee's No Evidence Motion for Summary Judgment, and are hereby incorporated by reference. The same evidence cited above that raises genuine issues of material fact, likewise presents more than a scintilla of evidence for each of the elements challenged within Appellee MRM's no-evidence motion. As such, the trial court erred in granting Appellee's no-evidence motion for summary judgment.

PRAYER

Appellee MRM has failed to offer sufficient evidence to conclusively negate its vicarious liability for the tortious conduct of Defendant Taylor. Therefore, the

trial court erred in granting Appellee MRM's Traditional Motion for Summary Judgement.

Further, the summary evidence meets and exceeds the level that would enable reasonable and fair-minded people to differ in their conclusions with respect to each of the challenged elements within Appellant Stroup's theories of vicarious liability, including respondeat superior, joint enterprise, and statutory vicarious liability. Because Stroup presents more than a scintilla of evidence to support each of the challenged elements of Stroup's cause of action, Appellee's no-evidence motion for summary judgment was improperly granted, and Stroup is entitled to a trial on the merits.

WHEREFORE, PREMISES CONSIDERED, Appellant prays that this Court reverse the order of the trial court granting Defendant's Traditional and No-Evidence Motion for Summary Judgment, and for such other and further relief to which Appellant's may be entitled.

Respectfully submitted,

FOGELMAN & VON FLATERN, LLP
3101 Bee Cave Road, Suite 270
Austin, Texas 78746
(512) 375-3198
(512) 372-3209 (telecopier)

By: */s/ Aaron von Flatern*
Aaron von Flatern
State Bar No. 24076892
aaron@fvlawfirm.com

COUNSEL FOR APPELLANT

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 1, 2018 a true and correct copy of the above and foregoing was served via electronic filing to all counsel below:

WALTERS, BALIDO & CRAIN, L.L.P.
Gregory R. Ave
Meadow Park Tower, Suite 1500
10440 North Central Expressway
Dallas, TX 75231
AveEdocsNotifications@wbclawfirm.com

COUNSEL FOR APPELLEE

*/s/ Aaron von Flatern*
Aaron von Flatern

## CERTIFICATE OF COMPLIANCE

I certify that this document contains 9,095 words (counting all parts of the document). The body text is in 14 point font, and the footnote text is in 12 point font.

*/s/ Aaron von Flatern*
Aaron von Flatern

## **APPENDIX**

I.      Judgment on appeal

II.     Tex. Occ. Code Excerpts

III.    *Gibson v. Davis Realty*

IV.     Independent Contractor Agreement

V.      Keller Williams Policies and Guidelines

VI.     Listing Agreement

VII.    Police Report

# I. Judgment on Appeal

CAUSE NO. D-1-GN-15-004909

| | | |
|---|---|---|
| SARAH DENISE STROUP, AS LEGAL GUARDIAN OF DOUGLAS LEE STROUP, AN INCAPACITATED PERSON | § § § § | IN THE DISTRICT COURT OF |
| VS. | § § | TRAVIS COUNTY, TEXAS |
| PENNY HARRINGTON TAYLOR AND MRM MANAGEMENT, INC. | § § § | 98th JUDICIAL DISTRICT |

## ORDER GRANTING DEFENDANT, MRM MANAGEMENT, INC.'S FIRST AMENDED TRADITIONAL AND NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT

On February 22, 2017, the Court considered Defendant MRM Management, Inc.'s First Amended Traditional and No-Evidence Motion for Summary Judgment (the "Motion"). After reviewing the Motion, Plaintiff's Response, the evidence presented, the arguments of counsel, and applicable law, the Court is of the opinion that the Motion should be and is hereby GRANTED.

IT IS THEREFORE ORDERED that Defendant MRM Management, Inc.'s First Amended Traditional and No-Evidence Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's claims against Defendant MRM Management, Inc. are DISMISSED with prejudice.

SIGNED this 28th day of February 2017.



JUDGE PRESIDING
KARIN CRUMP

005071659

ORDER GRANTING DEFENDANT, MRM MANAGEMENT, INC.'S FIRST AMENDED
TRADITIONAL AND NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT



407

# II. Tex. Occ. Code Excerpts



**User Name:** aaronvonflatern
**Date and Time:** Thursday, December 28, 2017 10:36:00 AM CST
**Job Number:** 58744145

## Documents (4)

1. Tex. Occ. Code § 1101.001
   **Client/Matter:** -None-
   **Search Terms:**
   **Search Type:**

2. Tex. Occ. Code § 1101.002
   **Client/Matter:** -None-
   **Search Terms:**
   **Search Type:**

3. Tex. Occ. Code § 1101.351
   **Client/Matter:** -None-
   **Search Terms:**
   **Search Type:**

4. Tex. Occ. Code § 1101.803
   **Client/Matter:** -None-
   **Search Terms:**
   **Search Type:**

# Tex. Occ. Code § 1101.001

This document is current through the 2017 Regular Session and 1st C.S., 85th Legislature

*Texas Statutes & Codes Annotated by LexisNexis® > Occupations Code > Title 7 Practices and Professions Related to Real Property and Housing > Subtitle A Professions Related to Real Estate > Chapter 1101 Real Estate Brokers and Sales Agents [Expires September 1, 2019] > Subchapter A General Provisions [Expires September 1, 2019]*

## Sec. 1101.001. [Expires September 1, 2019] Short Title.

This chapter may be cited as The Real Estate License Act.

## History

Enacted by Acts 2001, 77th Leg., ch. 1421 (H.B. 2813), § 2, effective June 1, 2003.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2017 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.

# Tex. Occ. Code § 1101.002

This document is current through the 2017 Regular Session and 1st C.S., 85th Legislature

*Texas Statutes & Codes Annotated by LexisNexis® > Occupations Code > Title 7 Practices and Professions Related to Real Property and Housing > Subtitle A Professions Related to Real Estate > Chapter 1101 Real Estate Brokers and Sales Agents [Expires September 1, 2019] > Subchapter A General Provisions [Expires September 1, 2019]*

## Sec. 1101.002. [Expires September 1, 2019] Definitions.

In this chapter:

(1) "Broker":

(A) means a person who, in exchange for a commission or other valuable consideration or with the expectation of receiving a commission or other valuable consideration, performs for another person one of the following acts:

(i) sells, exchanges, purchases, or leases real estate;

(ii) offers to sell, exchange, purchase, or lease real estate;

(iii) negotiates or attempts to negotiate the listing, sale, exchange, purchase, or lease of real estate;

(iv) lists or offers, attempts, or agrees to list real estate for sale, lease, or exchange;

(v) auctions or offers, attempts, or agrees to auction real estate;

(vi) deals in options on real estate, including a lease to purchase or buying, selling, or offering to buy or sell options on real estate;

(vii) aids or offers or attempts to aid in locating or obtaining real estate for purchase or lease;

(viii) procures or assists in procuring a prospect to effect the sale, exchange, or lease of real estate;

(ix) procures or assists in procuring property to effect the sale, exchange, or lease of real estate;

(x) controls the acceptance or deposit of rent from a resident of a single-family residential real property unit;

(xi) provides a written analysis, opinion, or conclusion relating to the estimated price of real property if the analysis, opinion, or conclusion:

(a) is not referred to as an appraisal;

(b) is provided in the ordinary course of the person's business; and

(c) is related to the actual or potential management, acquisition, disposition, or encumbrance of an interest in real property; or

(xii) advises or offers advice to an owner of real estate concerning the negotiation or completion of a short sale; and

(B) includes a person who:

(i) is employed by or for an owner of real estate to sell any portion

of the real estate; or

**(ii)** engages in the business of charging an advance fee or contracting to collect a fee under a contract that requires the person primarily to promote the sale of real estate by:

**(a)** listing the real estate in a publication primarily used for listing real estate; or

**(b)** referring information about the real estate to brokers.

**(1-a)** "Business entity" means a "domestic entity" or "foreign entity" as those terms are defined by Section 1.002, Business Organizations Code, that is qualified to transact business in this state.

**(2)** "Certificate holder" means a person registered under Subchapter K.

**(3)** "Commission" means the Texas Real Estate Commission.

**(4)** "License holder" means a broker or sales agent licensed under this chapter.

**(5)** "Real estate" means any interest in real property, including a leasehold, located in or outside this state. The term does not include an interest given as security for the performance of an obligation.

**(6)** "Residential rental locator" means a person who offers for consideration to locate a unit in an apartment complex for lease to a prospective tenant. The term does not include an owner who offers to locate a unit in the owner's complex.

**(7)** "Sales agent" means a person who is sponsored by a licensed broker for the purpose of performing an act described by Subdivision (1).

**(8)** "Subagent" means a license holder who:

**(A)** represents a principal through cooperation with and the consent of a broker representing the principal; and

**(B)** is not sponsored by or associated with the principal's broker.

## History

Enacted by Acts 2001, 77th Leg., ch. 1421 (H.B. 2813), § 2, effective June 1, 2003; am. Acts 2003, 78th Leg., ch. 1276 (H.B. 3507), § 14A.151, effective September 1, 2003; am. Acts 2011, 82nd Leg., ch. 1064 (S.B. 747), § 1, effective September 1, 2011; am. Acts 2015, 84th Leg., ch. 1158 (S.B. 699), § 2, effective January 1, 2016.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2017 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.

**End of Document**

This document is current through the 2017 Regular Session and 1st C.S., 85th Legislature

*Texas Statutes & Codes Annotated by LexisNexis® > Occupations Code > Title 7 Practices and Professions Related to Real Property and Housing > Subtitle A Professions Related to Real Estate > Chapter 1101 Real Estate Brokers and Sales Agents [Expires September 1, 2019] > Subchapter H License Requirements [Expires September 1, 2019]*

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2017 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.

**End of Document**

## Sec. 1101.351. [Expires September 1, 2019] License Required.

**(a)** Unless a person holds a license issued under this chapter, the person may not:

**(1)** act as or represent that the person is a broker or sales agent; or

**(2)** act as a residential rental locator.

**(a-1)** Unless a business entity holds a license issued under this chapter, the business entity may not act as a broker.

**(b)** An applicant for a broker or sales agent license may not act as a broker or sales agent until the person receives the license evidencing that authority.

**(c)** A licensed sales agent may not engage or attempt to engage in real estate brokerage unless the sales agent is sponsored by a licensed broker and is acting for that broker.

## History

Enacted by Acts 2001, 77th Leg., ch. 1421 (H.B. 2813), § 2, effective June 1, 2003; am. Acts 2011, 82nd Leg., ch. 1064 (S.B. 747), § 5, effective September 1, 2011; am. Acts 2015, 84th Leg., ch. 1158 (S.B. 699), § 29, effective January 1, 2016.

# Tex. Occ. Code § 1101.803

This document is current through the 2017 Regular Session and 1st C.S., 85th Legislature

*Texas Statutes & Codes Annotated by LexisNexis® > Occupations Code > Title 7 Practices and Professions Related to Real Property and Housing > Subtitle A Professions Related to Real Estate > Chapter 1101 Real Estate Brokers and Sales Agents [Expires September 1, 2019] > Subchapter Q General Provisions Relating to Liability Issues [Expires September 1, 2019]*

## Sec. 1101.803. [Expires September 1, 2019] General Liability of Broker.

A licensed broker is liable to the commission, the public, and the broker's clients for any conduct engaged in under this chapter by the broker or by a sales agent associated with or acting for the broker.

## History

Enacted by Acts 2001, 77th Leg., ch. 1421 (H.B. 2813), § 2, effective June 1, 2003; am. Acts 2015, 84th Leg., ch. 1158 (S.B. 699), § 89, effective January 1, 2016.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2017 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.

# III. California Case -*Gibson v. Davis Realty*

# Gipson v. Davis Realty Co.

[Civ. No. 20032. First Dist., Div. One. Apr. 18, 1963.]

THOMAS WESLEY GIPSON, a minor, etc., et al., Plaintiffs and Appellants, v. DAVIS REALTY COMPANY, Defendant and Respondent.

COUNSEL

Walkup & Downing, Bruce Walkup, Robert Ransom and Wiliam B. Boone for Plaintiffs and Appellants.

Hadsell, Murman & Bishop, Bishop, Murray & Barry, Herbert Chamberlain and Nelson Barry for Defendant and Respondent.

OPINION

MOLINARI, J.

This is an appeal from a judgment in favor of the defendant, Davis Realty Company, a corporation, in an action for damages for personal injuries.

Statement of the Case

On April 4, 1957, Mrs. Jane Gipson, who was pregnant with child, was being transported by ambulance to the Stanford Hospital where her child was to be delivered. A collision between the ambulance and an automobile owned and driven by Roland Shugg occurred at the intersection of 26th Avenue and Clement Street in San Francisco. The accident occurred at about 12:20 p.m. The child was born about 40 minutes after the accident. The child showed signs of brain damage immediately after the accident, it being subsequently determined that such damage was permanent and that the child was suffering from a disability diagnosed as cerebral palsy. A personal injury action was thereafter instituted by the child's father, Edward T. Gipson, as guardian ad litem on behalf of the child, by the said father in his individual capacity, and by Mrs. Gipson against the ambulance company and its driver, and against Shugg and Davis Realty Company, a corporation, as the alleged employer of Shugg. The cause proceeded to trial ultimately with the child (by his said guardian) and Edward T. Gipson, individually, as plaintiffs, and Davis Realty Company as the sole defendant. A trial was had before a jury and a verdict was returned against the plaintiffs fn. 1 and for the defendant. fn. 2 No attack is made on this appeal as to the substantiality of the evidence, the appeal being directed to the propriety of certain instructions and rulings made by the trial court. fn. 3 **[215 Cal. App. 2d 196]**

Did the Court Commit Prejudicial Error in the Giving of Instructions Regarding Burden of Proof?

[1] The trial court gave an instruction on its own motion as follows: "Where the evidence is contradictory, your decision must be in accordance with the preponderance thereof. It is your duty, however, if possible to reconcile such contradiction so as to make the evidence reveal the truth. If you are in doubt as to the preponderance of the whole evidence, then you must resolve that doubt in favor of the party who has not the burden of proof." fn. 4 (Italics added.) The appellants assert that this instruction is prejudicially erroneous in that it tells the jury that the appellants were required not only to prove their case by a preponderance of the evidence, but that they were required to convince the jury beyond all doubt as to the sufficiency of their proof.

A reading of the instruction does not indicate that the jury was told that the appellants were required to prove their case beyond all doubt. What the jurors were told, however, was that if they were in doubt as to whether the evidence preponderated in favor of the appellants, they were then to find that the appellants had not met the burden of proof. While we are of the opinion that instructions using the word "doubt" ought to be avoided in civil cases on the subject of burden of proof and preponderance of the evidence, we do **[215 Cal. App. 2d 197]** not believe that the instant instruction is erroneous. Although, inartfully drawn, its effect, when coupled with the other instructions given by the court on the subject, fn. 5 was to tell the jury that if, after weighing the whole evidence in the case, they were in the subjective state of being uncertain as to whether the evidence tending to prove the appellants' allegations had the greater weight, probability, quality and convincing effect than that presented by the opposing evidence, they were to decide that the appellants had not met the burden of proof. The jurors were not told by this instruction that the things which the appellants were required to prove must not admit of any doubt, but rather, that, if after weighing the whole evidence in support of these things, they were in the frame of mind where they could not say that such evidence preponderated on the side of the appellants, they were to conclude that it did not so preponderate.

The appellants have cited several cases in support of their assertion of error, fn. 6 but these are distinguishable from the instruction in the instant case primarily because of the specific language used, and the connotation it conveyed, that the degree of certainty indicated with reference to the particular allegations to be proved must not only be beyond doubt, but must not admit of any doubt at all. In Greenleaf v. Pacific Tel. & Tel. Co., 43 Cal. App. 691, 693 [185 P. 872], the portion of the instruction which resulted in a reversal read as follows: " '[A]nd if the preponderance of the evidence fails to satisfy you that the fire was so caused, or leaves in your mind any doubt, confusion or uncertainty as to the origin of the fire, your verdict should be for the defendant.' " (P. 693.) The erroneous instruction given in Colbert v. Borland, 147 Cal. App. 2d 704, 712 [306 P.2d 53], stated that: " 'The burden is upon each plaintiff in these cases to prove the affirmative of his case by a preponderance of the evidence. Therefore, you may not speculate as to whether any conduct on the part of either defendant was a proximate cause of the accident or of any one of plaintiff's injuries or damages, and if the evidence leaves these things a matter of conjecture or doubt, then that plaintiff has not sustained the burden of **[215 Cal. App. 2d 198]** proof required of him under the law as against that defendant.' " (Italics partly added.) The instruction given in Meschini v. Guy F. Atkinson Co., 160 Cal. App. 2d 609, 615 [325 P.2d 213], was almost identical to the one condemned in Colbert. In Banes v. Dunger, 181

Cal. App. 2d 276, 282 [5 Cal. Rptr. 278], the court gave an instruction to the effect that the jury was not to speculate as to any injuries claimed by the plaintiffs, and that if the evidence left the existence or cause of any alleged injuries a matter of conjecture or doubt, that then the plaintiffs had not sustained the burden of proof. The Perrett v. Southern Pac. Co., 73 Cal. App. 2d 30 [165 P.2d 751], case did not involve the use of the word "doubt." There an instruction was given that the defendant could be held liable only " 'upon proof which satisfies your mind that the plaintiff's injuries were proximately caused by some negligence upon its part.' " (P. 38; italics added.)

In Popejoy v. Hannon, 37 Cal. 2d 159 [231 P.2d 484], the court on its own motion instructed that: " 'The defendants, however, are not required to prove by a preponderance of the evidence that they were free from negligence which proximately caused the lumber to fall. They are bound to produce only sufficient evidence to create in your minds such doubt as to why the lumber fell that you cannot say you are convinced by a preponderance of the evidence that the falling of the lumber was proximately caused by the negligence of the defendants.' " (Pp. 164-165.) The defendants there complained of the instruction, and while the appellate court had some misgivings as to the instruction (not because of the use of the word "doubt," but because it tended to place upon the defendants the requirement to present direct evidence either of their freedom from negligence or the absence of proximate cause), it held that the instruction was not prejudicial under circumstances wherein an instruction was given at the request of the defendants substantially in the form of BAJI No. 21. fn. 7 The court there said that there was "little difference" between the challenged instruction and the one requested by the **[215 Cal. App. 2d 199]** defendants, and that "The effect of the instruction complained of was to say that the Hannons [the defendants], in order to defeat Popejoy's [the plaintiff's] claim, had the duty to produce a preponderance of evidence to the contrary." fn. 8 (P. 165.)

It should be here noted that the appellants themselves claim error on the part of the court in failing to give an instruction requested by them containing the following language: "It is the duty of the jury to decide for the plaintiff if the weight of the evidence preponderates, according to the reasonable probability of truth, in favor of the plaintiff's claims, even though the minds of the jurors are not free from doubt." (Italics added.) The court did not give this instruction but placed thereon the notation: "Given as Modified." The court was apparently of the opinion that in essence this instruction was covered by the subject instruction to the extent that the former was modified by the latter. We see little difference between the two instructions. Suffice it to say, the terminology "greater probabilities of truth," "probability of the truth" and the "greater probability" with reference to the meaning of "preponderance of evidence" in burden of proof instructions is in common use by the courts and has been approved. (See Popejoy v. Hannon, supra, 37 Cal. 2d 159; and see BAJI No. 21, rev. 1962.) fn. 9 The word "probability" by its very definition leaves some room for doubt. In Brown v. Beck, 63 Cal. App. 686 [220 P. 14], we find the following language: " 'Probability' means the state or character of being probable. Webster's and the Century dictionaries define 'probable' as follows: 'Having more evidence for than against; supported by evidence which inclines the mind to belief but leaves some room for doubt; likely.' This definition is accepted in numerous cases in which the word 'probable' is construed." (Pp. 697-698.)

Did the Court Commit Prejudicial Error in the Giving and Refusing to Give Instructions as to the Effect of the Employment Contract?

At the time of the accident in question Shugg was one of four stockholders in the respondent corporation. He was neither an officer nor a director of the corporation. On February 19, 1957, Shugg entered into a contract with the respondent **[215 Cal. App. 2d 200]** entitled "Desk Space Contract with Tenant- Salesman." According to said contract Shugg agreed to pay 50 per cent of the profits from his real estate activities in exchange for the desk space, telephone, stenographic, and bookkeeping services located at 5000 Geary Boulevard, San Francisco. The said agreement further provided that Shugg was not to be deemed to be an employee of the respondent, and that the latter did not control or have any right of control over Shugg's acts. Attached to the contract was a separate agreement concerning the disposition of gross commissions, a detailed schedule setting out the division of various sales commissions, and a list of working conditions one of which was that all employees were required to show a Mrs. McAnaw fn. 10 that they carried adequate automobile liability insurance. Other conditions and stipulations made reference to "salesman" and to "broker." Testimony was adduced at the trial to the effect that the above contract was entered into with the intent of saving the necessity of keeping bookkeeping records and with the intent on the part of the respondent to treat its salesmen as independent contractors. Shugg testified, however, that it was not the intent to make the salesman independent contractors because the salesmen knew that they could not be such as they were not licensed as brokers.

The evidence discloses that Shugg was licensed as a real estate salesman only, and that he never had been licensed as a broker. It appears that all transactions entered into by Shugg were in compliance with the California Business and Professions Code regulating real estate transactions; that all real estate deals made by Shugg were made in the name of "Davis Realty"; that deposit receipts and similar papers were signed " 'Davis Realty, by R. P. Shugg' "; and that all listings brought in by Shugg were signed as listings of Davis Realty which would remain the property of Davis Realty if Shugg resigned. There was testimony, also, that all advertising was in the name of Davis Realty; that Shugg, when conducting a transaction, represented to customers that he was acting for Davis Realty; that the salesmen were expected to rotate "floor days" during which they stayed in the office all day, took calls, and met people who came in off the street; and that Shugg was required, as a salesman, to satisfy Mrs. McAnaw that he had adequate automobile liability insurance. **[215 Cal. App. 2d 201]**

The "Working Agreement" referred to above provided that all salesmen could be terminated on 30-day notice. In this regard, Shugg testified that a couple of salesmen were asked to transfer their licenses to other brokers; and Ross, respondent's president, testified that while the company had never fired anyone, a couple of salesmen were asked to terminate because of an infraction of policy.

After defining for the jurors the meaning of "independent contractor" and "agent," and instructing them that if they found Shugg to be an independent contractor then the respondent would not be liable, but if they found him to be an agent, acting within the

4

scope of his authority at the time of the accident, the respondent would be liable, the court gave the following instruction with regard to the employment contract between Shugg and Davis Realty Company, to wit: "The contract which exists between the Davis Realty Company and Roland Shugg is prima facie evidence of the relationship between them. That is to say in the absence of any other evidence it is the controlling factor in determining whether or not Roland Shugg was at the time of the accident an independent contractor. However, where further evidence is introduced with respect to the actual working arrangement between the parties you may take this into consideration in making your decision as to the relationship between the parties. You may look at the actual working arrangement in the light of the rules previously read to you and recall that the decisive test of the relationship is who has the right to direct what shall be done, when and how it shall be done. Or to put the test in another form, who has the right to general and immediate control over the progress and method of the work involved." (Italics added.)

The appellants contend that prejudicial error was committed by the trial court in the giving of this instruction. The objection is directed to the use of the words "prima facie evidence" and "controlling factor. ..." It is argued by the appellants that this instruction purported to attribute to the contract some conclusive or presumptive effect. The appellants assert that the jury could find by the other evidence produced that the rule relationship between Shugg and Davis Realty was that of principal and agent and that in so doing the jury was at liberty to ignore the provisions of the contract which purport to negate such relationship. The appellants argue further that while the court did instruct the jury that it "may" consider such other evidence, a correct instruction **[215 Cal. App. 2d 202]** would have stated that it "must" consider such evidence. The proper instruction, say the appellants, was that embodied in their proposed instruction number 65, which the court refused to give. fn. 11 The appellants claim that such refusal was prejudicial error.

[2] The instruction given was a correct statement of the law insofar as it declared that the relation of the parties to a written contract of employment is prima facie that which is expressed by the terms of their writing. (Luckie v. Diamond Coal Co., 41 Cal. App. 468, 479 [183 P. 78]; Stewart & Nuss v. Industrial Acc. Com., 55 Cal. App. 2d 501 [130 P.2d 985].) [3] It is proper, moreover, in view of the established rule that parol evidence is admissible in an action by one not a party to an employment contract to show the true relationship between the parties (Broder v. Epstein, 101 Cal. App. 2d 197, 199 [225 P.2d 10]; Marx v. McKinney, 23 Cal. 2d 439, 442 [144 P.2d 353]; Luckie v. Diamond Coal Co., supra, p. 478; and see Code Civ. Proc., § 1856), for a trial court to admit extrinsic evidence to be weighed against the presumption afforded by such prima facie evidence. Such extrinsic evidence was so admitted in the present case. The questioned instruction, however, tells the jury that it "may" take such evidence into consideration. [4] While in the construction of statutes the word "may" is often interpreted to mean "must" or "shall," the word is primarily and ordinarily a permissive term and is so understood by laymen. The word "may" here imported to the jury that it might, or might not, at its option, consider such evidence. (See White v. Disher, 67 Cal. 402, 404 [7 P. 826].) [5] A jury is duty bound to consider and weigh all of the evidence received by the court under appropriate instructions. (Borenkraut v. Whitten, 56 Cal. 2d 538, 546 [15 Cal. Rptr. 635, 364 P.2d

467]; Ensign v. Southern Pac. Co., 193 Cal. 311, 323 [223 P. 953].) The instruction **[215 Cal. App. 2d 203]** proposed by the appellants, on the other hand, appears to state the rule of Broder and Luckie correctly and should have been given by the court, fn. 12 assuming, of course, that it was proper for the court to instruct on the effect of the employment contract.

[6a] We are of the opinion, however, that it was error for the court to have given any instructions on the effect of the employment contract because Shugg was an agent of the respondent as a matter of law. A proper instruction, therefore, would have been one so advising the jury. In Grand v. Griesinger, 160 Cal. App. 2d 397 [325 P.2d 475], it was held that a real estate salesman "is strictly the agent of the broker." (P. 406; italics added.) The appellate court was there called upon, in a salesman license revocation case, to interpret the Real Estate Act (Bus. & Prof. Code, §§ 10000-11709) in its application to the relationship between a real estate broker and a real estate salesman. In discussing the applicable statutes the reviewing court pointed out that "[t]he differences in language are small, but the divergence in import is large." (P. 405.) After citing sections 10131 fn. 13 and 10132, fn. 14 defining "real estate broker" and "real estate salesman," respectively, the court observed as follows: "A broker performs the specified services 'for another or others,' meaning the public, while a salesman must be 'employed by a licensed real estate broker.' Both act for compensation, but the salesman cannot 'be employed by or accept compensation from any person other than the broker under whom he is at the time licensed.' " (P. 405; italics added; citing § 10137.) The **[215 Cal. App. 2d 204]** court went on to point out that a salesman can only get a license on the recommendation of the broker who is to be his employer (§ 10151); that when a salesman's application is granted his license goes into possession of his broker-employer and there remains until cancelled or the salesman leaves the employ of the broker (§ 10160); and that the broker must " 'exercise reasonable supervision over the activities of his salesmen' " or hazard the suspension or revocation of his own license (§ 10177, subd. (h); p. 405]. The conclusion reached by Grand, after a review of the foregoing statutes and other related provisions, is that: "The entire statutory scheme requires the broker actively to conduct his brokerage business and to supervise the activities of his salesmen." (P. 406.)

The respondent maintains that whether a real estate salesman is an employee or agent on the one hand, or an independent contractor on the other, is a question of fact dependent upon the particular circumstances of each case. In support of this proposition it cites the following cases: California Emp. Stab. Com. v. Norins Realty Co. (1946) 29 Cal. 2d 419 [175 P.2d 217]; California Emp. Stab. Com. v. Morris (1946) 28 Cal. 2d 812 [172 P.2d 497]; and Royal Indem. Co. v. Industrial Acc. Com. (1930) 104 Cal. App. 290 [285 P. 912]. In Morris the question before the Supreme Court was whether a real estate salesman was to be deemed "in employment" within the meaning of the Unemployment Insurance Act. The court held that "[t]he Real Estate Act ... does not establish as a matter of law the status of every salesman as being 'in employment' within the meaning of the Unemployment Insurance Act." (P. 817.) The rationale of Morris is that "[t]he Real Estate Act of this state does not expressly give the employer the right to control the manner and means of accomplishing the result desired, nor do its provisions conclusively negative all of the other factors to be considered in determining whether one

6

is an independent contractor. Accordingly, the occupation of real estate salesman, insofar as the Unemployment Insurance Act is concerned, is one that may be classified as that of an employee, or an independent contractor, depending upon the facts of the particular case." (P. 818; italics added.) Norins Realty Co. also involved the applicability of the Unemployment Insurance Act to real estate salesmen. It follows the holding in Morris. The Royal Indem. Co. case was concerned with workmen's compensation benefits. Like Morris, it held that whether the relationship of a real estate salesman to a broker is that of **[215 Cal. App. 2d 205]** an employee or independent contractor is a question depending upon the facts of the particular case. The holding there turned upon the lack of any evidence showing control over the means, manner or mode of the work exercised by the salesman.

We are persuaded that the distinction between Grand, on the one hand, and Morris, Norins Realty Co. and Royal Indem. Co., on the other, lies in the difference between an "employee" and an "agent." The basis of the holding in Morris and Norins Realty Co., with reference to the Unemployment Insurance Act, and Royal Indem. Co., with reference to the Workmen's Compensation Act, is that, insofar as these acts are concerned, the common law definition of master and servant is the measure of the relationship between the parties, and that the statutory definition of salesman in the Real Estate Act does not make a real estate salesman an "employee" within the meaning of these acts as a matter of law. [7] An "employee" is one who is subject to the absolute control and direction of his employer in regard to any act, labor or work to be done in the course and scope of his employment. (Crooks v. Glens Falls Indem. Co., 124 Cal. App. 2d 113, 121 [268 P.2d 203].) The term "employee" has been held to be synonymous with the word "servant." (Press Pub. Co. v. Industrial Acc. Com., 190 Cal. 114, 122 [210 P. 820]; Western Indem. Co. v. Pillsbury, 172 Cal. 807, 810 [159 P. 721].) Section 3000 of our Labor Code (formerly Civ. Code, § 2009) defines a servant as follows: "A servant is one who is employed to render personal service to his employer, other than in the pursuit of an independent calling, and who in such service remains entirely under the control and direction of the employer, who is called his master." An "agent" is defined by section 2295 of the Civil Code as follows: "An agent is one who represents another, called the principal, in dealings with third persons." While one may be both a servant and an agent (Ingle v. Bay Cities Transit Co., 72 Cal. App. 2d 283, 286 [164 P.2d 508]), the terms are not wholly synonymous. (People v. Treadwell, 69 Cal. 226, 236 [10 P. 502].) Although both relate to voluntary action under employment and express the idea of service, the service performed by a servant may be inferior in degree to work done by an agent for his principal. [8] Accordingly, while both a servant and an agent are workers for another under an express or implied employment, an agent works not only for, but in the place of, his **[215 Cal. App. 2d 206]** principal. (People v. Treadwell, supra, p. 236.) It is apparent from a reading of section 3000 of the Labor Code that the relationship of master and servant contemplates that the servant be entirely under the control and direction of the employer; it presupposes also the right to direct the method and mode of doing the service. (See Fay v. German General Benevolent Soc., 163 Cal. 118, 121 [124 P. 844]; Chinnis v. Pomona Pump Co., 36 Cal. App. 2d 633, 637 [98 P.2d 560].) [9] The distinguishing features of an agency, on the other hand, are its representative character and its derivative authority. (Store of Happiness v. Carmona & Allen, Inc., 152 Cal. App.

2d 266, 269 [312 P.2d 1104].) [10] As stated in Wallace v. Sinclair, 114 Cal. App. 2d 220 [250 P.2d 154]: "Agency is the relation that results from the act of one person, called the principal, who authorizes another, called the agent, to conduct one or more transactions with one or more third persons and to exercise a degree of discretion in effecting the purpose of the principal. The heart of agency is expressed in the ancient maxim: 'Qui facit per alium facit per se.' " (P. 229; italics partly added.)

It should be noted, moreover, that Morris, Norins Realty Co. and Royal Indem. Co. were decided prior to the addition by the Legislature in 1955 of subdivision (h) to section 10177, providing an additional ground for the suspension or revocation of a real estate broker's license, i.e., that such broker's license may be suspended or revoked if he fails "to exercise reasonable supervision over the activities of his salesmen." The presence of this provision in the Real Estate Law, read in conjunction with the other provisions applicable to real estate salesmen, was deemed by the reviewing court in Grand to be indicative of a legislative intent to create by statute, as between a real estate broker and the salesman licensed under such broker, respectively, the relationship of principal and agent.

[11] We are satisfied, accordingly, that while it may be a question of fact whether in each case a real estate salesman is an employee within the common law definition of master and servant, the Legislature has, by virtue of statutory enactment, made such a salesman an agent of the broker as a matter of law. [12] A consideration of the several statutory provisions applicable to a real estate salesman impels the conclusion that such person can act only for, on behalf of, and in place of the broker under whom he is licensed, and that his acts are limited to those which he does and performs **[215 Cal. App. 2d 207]** as an agent for such broker. (Galbavy v. Chevelin Realty Corp., 58 Cal. App. 2d Supp. 903, 906 [136 P.2d 134].) [13] We conclude, therefore, that a salesman, insofar as his relationship with the broker who employs him is concerned, cannot be classed as an independent contractor. Accordingly, any contract which purports to change that relationship from that of agent to independent contractor is invalid as being contrary to the provisions of the Real Estate Law. (See Civ. Code, §§ 1608, 1667.) [6b] It was reversible error for the court, therefore, to instruct the jury that the contract of employment between Shugg and the respondent was "prima facie" evidence of their relationship in view of the terms of the contract providing that the relationship was that of independent contractor. In the absence of such error it is reasonably probable that a result more favorable to the appellants might have been reached. (See People v. Watson, 46 Cal. 2d 818, 835-836 [299 P.2d 243].)

While the error in this latter respect was induced by both the respondent and the appellants, it was not "invited error" on the part of appellants. The case was tried on the theory that the question whether Shugg was an independent contractor was one of fact for the jury and instructions were submitted by both sides not only on the effect of the subject employment contract, but on the meaning and definition of the relationship of independent contractor. [14] It is well settled law that where a litigant invites error by offering instructions on a certain issue, he is in no legal position to complain that it was error to give instructions offered by the adversary, or given by the court on the same issue. (Fuentes v. Panella, 120 Cal. App. 2d 175, 182 [260 P.2d 853]; Wells v. Lloyd, 21

Cal. 2d 452 [132 P.2d 471].) [15] In the instant case the doctrine of invited error would preclude the appellants from complaining that the court instructed on the issue of whether or not Shugg was an independent contractor and of the effect of the employment contract with respect to the relationship between the respondent and Shugg. The doctrine does not, however, estop the appellants from urging on appeal that an instruction given on that issue was in fact erroneous. As we have pointed out above, even if it had been proper for the court to instruct on the effect of the employment contract with respect to the relationship in question, the instruction given on the subject was prejudicially erroneous. The doctrine of invited error precludes a party from an objection on appeal to an instruction substantially the same **[215 Cal. App. 2d 208]** as the one requested by him, or invited by an instruction requested by him, or to the part of an instruction containing the same vice as the one submitted by him. (Jentick v. Pacific Gas & Elec. Co., 18 Cal. 2d 117, 122 [114 P.2d 343]; Smith v. Kile, 147 Cal. App. 2d 314, 317 [304 P.2d 1034]; Jansen v. Southern Pac. Co., 112 Cal. App. 2d 833, 845 [247 P.2d 581]; Yolo Water & Power Co. v. Hudson, 182 Cal. 48, 51 [186 P. 772]; George v. City of Los Angeles, 51 Cal. App. 2d 311, 319-320 [124 P.2d 872].) In the present case the instruction submitted by the appellants on the effect of the employment was substantially different from that submitted by the respondent; it did not contain the same vice. [16] The doctrine of invited error does not apply where the instruction objected to on appeal contains elements or additions substantially different from that contained in the instruction submitted by appellant, particularly where such instruction is prejudicial to him and is not the law. (Baker v. Borello, 131 Cal. 615, 616-617 [63 P. 914]; Dowd v. Atlas Taxicab etc. Co., 69 Cal. App. 9, 14 [230 P. 958].)

Did the Court Commit Error in Refusing Instructions Defining the Right of Control and the Factors to be Considered?

Substantial evidence regarding the control of the respondent over Shugg was submitted by both parties on the issue of whether Shugg was an agent or independent contractor, and instructions on the subject of control were given to the jury. The appellants contend that the jury was not informed as to the difference between the right of control and the actual exercise of control. In view of our conclusion that a real estate salesman is an agent of the broker, under whose license he operates as a matter of law, the question of control need not be discussed as instructions on that issue were not necessary in the present case. The important question is whether, at the time of the accident in question, Shugg, as such agent, was acting within the course and scope of his employment.

Were the Instructions and Rulings as to the Scope of Employment Erroneous?

The facts leading up to the accident appear to be undisputed. Shugg testified: that on the morning of the accident he was at the office of Davis Realty; that he left the office for the purpose of going to 38th Avenue and Clement Street to try to obtain a listing on a house at that corner on behalf of Davis Realty; that his sole intention upon leaving the office was to look at that property; that Davis Realty is located at **[215 Cal. App. 2d 209]** 14th Avenue and Geary Boulevard; that he drove north one block to Clement Street and then drove west on Clement; that as he started out on Clement Street he noticed it was around

noon, so he decided to stop by at his home for lunch and then continue out to look at the property after lunch; that he was driving west on Clement Street, somewhere between 14th and 26th Avenues when he made this decision; that he lived on 32nd Avenue, two blocks north of Clement Street; fn. 15 that the entire trip from Davis Realty to 38th Avenue and Clement Street would have involved a distance of about 21 blocks; that the respondent did not instruct its salesmen as to when or where they should eat lunch; that it was the usual practice to stop at a convenient location for lunch and then continue on with the business of Davis Realty; that he ate lunch at home if he happened to be in the area; that after he reached the decision to eat lunch at home he continued along Clement Street. fn. 16

[17] It is elementary that the liability of the principal or employer is predicated upon the fact of employment. [18] Accordingly, the principal or employer is not liable for the acts of his agent or employee while the latter is pursuing his own ends, even though the injury complained of could not have been committed without the facilities afforded to the agent or employee by his relation to his principal or employer. (Kish v. California State Automobile Assn., 190 Cal. 246, 248 [212 P. 27].) [19] Therefore, whether or not the principal or employer is responsible for the act of the agent or employee at the time of the injury depends upon whether the agent or employee was engaged at that time in the transaction of the business of his principal or employer, or whether he was engaged in an act which was done for his own personal convenience or accommodation and related to an end or purpose exclusively and individually his own. (Kish v. California State Automobile Assn., supra, pp. 248-249.) [20] Accordingly, it is the general rule that an employee on his way to lunch, even though he is driving an automobile which is the property of the master, is not engaged in furthering any end of the employer, and that therefore under such circumstances, the servant is not acting within **[215 Cal. App. 2d 210]** the scope of his employment. (Carnes v. Pacific Gas & Elec. Co., 21 Cal. App. 2d 568, 572 [69 P.2d 998, 70 P.2d 717]; Peccolo v. City of Los Angeles, 8 Cal. 2d 532, 535-536 [66 P.2d 651]; Adams v. Tuxedo Land Co., 92 Cal. App. 266, 269-270 [267 P. 926]; Helm v. Bagley, 113 Cal. App. 602, 605 [298 P. 826]; Martinelli v. Stabnau, 11 Cal. App. 2d 38, 40 [58 P.2d 956].) [21] The so-called "lunch hour rule," enunciated by the foregoing cases, is, however, subject to an exception termed the "dual or combined purpose rule." The latter rule was stated thusly in Ryan v. Farrell, 208 Cal. 200 [280 P. 945]: "[W]here the servant is combining his own business with that of his master, or attending to both at substantially the same time, no nice inquiry will be made as to which business the servant was actually engaged in when a third person was injured; but the master will be held responsible, unless it clearly appears that the servant could not have been directly or indirectly serving his master." (P. 204.) This rule was followed and applied in Cain v. Marquez, 31 Cal. App. 2d 430, 441 [88 P.2d 200]; Loper v. Morrison, 23 Cal. 2d 600, 606 [145 P.2d 1]; and Fuller v. Chambers, 169 Cal. App. 2d 602, 608 [337 P.2d 848].

In Ryan, an automobile salesman made a trip from San Diego to Pacific Beach to interview a prospective purchaser and was making the return trip when he injured the plaintiff. It was there held that an employee who has gone upon an errand on behalf of his master does not cease to be acting in the course of his employment at the moment he starts upon the return trip after having performed the errand. The Cain case held that

there were facts sufficient to warrant the case going to the jury on the issue as to whether the employee was acting within the scope of his employment where the employee went home in his own car to get tools to be used in his employer's work, then went to dinner, and on his way back to work became involved in an accident. Loper, on its facts, is similar to the case at bench. There a milk route employee, Morrison, left his employer's place of business in his own (Morrison's) car for the purpose of collecting a delinquent account owed his employer by a Mrs. Hanson, a customer on his route. Morrison was accompanied by a fellow employee, Dolan, whom he had offered a ride home. Upon finding that Mrs. Hanson was not at home Morrison decided to call again later. While waiting for Mrs. Hanson to return, Morrison went with Dolan to a tavern near Dolan's home for sandwiches and beer, and then took Dolan home. While returning from **[215 Cal. App. 2d 211]** Dolan's home on his way to the Hanson home Morrison was involved in an accident. Dolan lived about 2 miles outside the area covered by the milk route and the accident occurred before Morrison reached the boundaries of his route. The court there held that it could not determine as a matter of law that the employee was outside the scope of his employment, the test being whether there had been a deviation so material or substantial as to constitute a complete departure, and that this determination was a question of fact. The Supreme Court went on to state that "[t]he employer's liability was not necessarily terminated by reason of the fact that Morrison combined a private purpose of his own with the business of his employer." (P. 606; citing the above rule announced in Ryan.) In Fuller an employee was driving a company car from San Francisco to Fresno on business. Instead of going by the most direct route, i.e., via Gilroy and Pacheco Pass, he detoured by way of Camp Roberts in Monterey County to pick up friends. The accident occurred after leaving Camp Roberts about 16 miles out of Lemoore (Kings County) along Route 41 toward Fresno. Applying the legal principle expressed in Ryan, the court held that there was sufficient evidence to support a finding that the employee was acting within the course and scope of his employment.

The "dual or combined purpose rule" was recognized also in Richards v. Metropolitan Life Ins. Co., 19 Cal. 2d 236 [120 P.2d 650]. There an insurance agent in the employ of Metropolitan Life Insurance Company used his own car in soliciting insurance, in delivering policies, in collecting premiums and in trips to the company's office. He paid all expenses of maintaining and operating said car. He was required by the company to attend daily meetings at its office in the morning. On the morning of the accident the employee was on his way from his home to the office of the company to attend a meeting of the agents and to deliver premiums collected on the day previous. Because his duties encompassed both office and field work in a territory allocated to him by the company, and because he had to attend daily meetings at the company's office and was required to deliver premiums at such office either before or after doing such field work, the Supreme Court held that there was substantial evidence before the trial court on the issue as to whether the agent was acting within the course of his employment at the time of the accident to warrant the denial of a motion for nonsuit.

[22] In the instant case it cannot be said that at the time **[215 Cal. App. 2d 212]** of the accident Shugg was engaged in an act which was done for his own personal convenience or accommodation and related to an end or purpose exclusively and individually his own.

11

The testimony shows that, initially, his sole intent was to attend to the business of his principal at 38th Avenue and Clement Street. En route, he decided to combine his business with that of Davis Realty. This is the extent of his deviation. Moreover, we do not even have a departure from the original route of travel as was the case in Cain, Loper and Fuller. The court below would, therefore, have been justified in giving an instruction based upon the legal principle declared in Ryan. Such an instruction was proposed by the appellants, fn. 17 but was not given. fn. 18 [23] Instead, after giving instructions defining generally the terms "principal" and "agent," the scope of an agent's authority, the meaning of "course and scope of employment" (including appellants' proposed instruction set out in footnote 18), and an instruction based upon the "return from an errand" principle (also declared in Ryan), the court below gave the following instruction: "An employee driving his own car to a meal may or may not be acting in the course and scope of his employment even though he is traveling with the intention of resuming his duties after eating. If the primary purpose of the trip is for the meal, then he is not in the course and scope of his employment. If the primary purpose is for the business of his employer, then he is within the course and scope of his employment." This instruction is clearly erroneous, and materially **[215 Cal. App. 2d 213]** at variance with the principle announced in Ryan. The rule in Ryan is not reduced to a determination of which business (i.e., his own or that of the master) is primary or dominant, or even as to which business the servant was actually engaged in at the time of the accident, but to whether, at such time, the servant is combining his own business with that of his master or attending to both at substantially the same time. [24] The essential inquiry, in each instance, is whether there has been a deviation so material or substantial as to constitute a complete departure from the agent's strict course of duty, and this determination is usually a question of fact. (Loper v. Morrison, supra, 23 Cal. 2d 600, 606-607; Fuller v. Chambers, supra, 169 Cal. App. 2d 602, 608-609; Westberg v. Willde, 14 Cal. 2d 360, 372-373 [94 P.2d 590].) [25] The applicable rule has been stated thusly: "One does not cease to be acting within the course of the master's employment because his most direct and immediate pursuit of the master's business is subject to necessary, usual or incidental personal acts, nor even by slight and immaterial delays or deflections from the most direct route for a personal or private purpose, the pursuit of the master's business continuing to be the controlling purpose. Such acts, not amounting to a turning aside completely from the master's business so as to be inconsistent with its pursuit, are often only what might be reasonably expected, to which, therefore, the master's assent may be fairly assumed; or they are in many instances the mingling with the pursuit of the master's business some purpose of the servant's own." (Shearman & Redfield on Negligence (6th ed) § 147a; cited with approval in Kruse v. White Brothers, 81 Cal. App. 86, 92-93 [253 P. 178]; Westberg v. Willde, supra, pp. 372-373; Fuller v. Chambers, supra, p. 608.)

The respondent asserts that even if the above instruction is erroneous, it is the result of invited error on the part of the appellants. Although the said instruction bears the notation that it was requested by the respondent, the respondent maintains that this instruction was not submitted by it, but was one prepared by the court, pursuant to the stipulation and agreement of the parties. The respondent has filed a motion herein seeking to augment the record to show that the said instruction was given by stipulation and agreement of the parties. The motion is supported by an affidavit of counsel for the

12

respondent to the effect that the subject instruction was a modification of an instruction submitted by it fn. 19 after a conference **[215 Cal. App. 2d 214]** in the chambers of the trial judge, during which both sides agreed and stipulated that the instruction in the form in which it was ultimately given would correctly state the law and be acceptable to both sides. The said affidavit states further that the said modified instruction was prepared by the clerk of the court at the direction of the judge. This latter assertion is supported by an affidavit executed by the said clerk and by the court reporter for the said trial judge. Counsel for appellants, in turn, has filed a counteraffidavit to the effect that it is true that the court did modify the respondent's said proposed instruction, after appellants objected to it, and that the trial court did direct either the clerk or the court reporter to type the proposed instruction as modified. Appellants' counsel denies, however, that he agreed or stipulated to the instruction as modified, and denies that he stipulated or agreed that it was a correct statement of the law. [26] We thus have a sharp conflict in the affidavits. In such a case we should resolve the conflicts against the party who challenges the action taken by the court below. Since all intendments are in favor of such action, we must give considerable weight to the designation by the court as appears in the reporter's transcript to the effect that the instruction in question was given at the request of the respondent. (See Cameron v. Cameron, 110 Cal. App. 2d 258, 261 [242 P.2d 408]; DeWit v. Glazier, 149 Cal. App. 2d 75, 81-82 [307 P.2d 1031].) The proposed instruction was an erroneous statement of the law. The instruction given, even if considered as a modification of the one proposed, did not cure the error. It appears, therefore, that the error was invited by the respondent, rather than by the appellants. Moreover, it would avail nothing to augment the record to reflect the notation requested by the respondent because this cause will have to be retried, in any event, in view of the other prejudicial error in the record.

[27] The appellants also assign as error the sustaining of an objection to the following question directed to Shugg: "And would you say it was only an incidental purpose when you decided to change your route to stop by your house and get something to eat?" The objection was sustained on the ground that it was for the jury to determine Shugg's primary purpose. The question was clearly objectionable because it called for the witness' conclusion. The extent and substantiality **[215 Cal. App. 2d 215]** of Shugg's deviation, if any, was a question of fact for the jury.

The respondent's motion to augment the record is denied. The judgment is reversed.

Bray, P. J., and Sullivan, J., concurred.

FN 1. Hereinafter referred to as appellants.

FN 2. Hereinafter referred to as respondent.

FN 3. In discussing such instructions and rulings we shall hereinafter refer to such facts in the record as shall be pertinent thereto.

FN 4. Other instructions were given by the court on the subject of burden of proof, as follows:

(a) "In Civil actions, and this is a Civil action, the party who asserts the affirmative of an issue must carry the burden of proving it. This means that if no evidence were given on either side of such issue, your findings as to it would have to be against that party. In determining whether the burden of proof has been sustained you will consider all of the evidence bearing upon the issue, regardless of which party introduced it."

(b) "In civil cases a preponderance of evidence is all that is required, and the burden rests upon one who asserts the affirmative of an issue to prove his allegations by a preponderance of evidence."

(c) "By a preponderance of evidence is meant such evidence as, when weighed with that opposed to it, has more convincing force, and from which it results that the greater probability is in favor of the party upon whom the burden of proof rests."

(d) "Preponderance of evidence means not the greater number of witnesses, but the greater weight, probability, quality and convincing effect of the evidence, and proof offered by the party holding the affirmative as compared with the opposing evidence."

(e) "Whenever, in these instructions, I state that the burden of proof rests upon a certain party to prove a certain allegation made by him, the meaning of such an instruction is this: That unless the truth of that allegation is proved by a preponderance of the evidence, you shall find that allegation to be not true."

FN 5. The questioned instruction followed the other instructions on burden of proof which we have set out in footnote 4.

FN 6. Greenleaf v. Pacific Tel. & Tel. Co., 43 Cal. App. 691 [185 P. 872]; Colbert v. Borland, 147 Cal. App. 2d 704 [306 P.2d 53]; Meschini v. Guy F. Atkinson Co., 160 Cal. App. 2d 609 [325 P.2d 213]; Banes v. Dunger, 181 Cal. App. 2d 276 [5 Cal. Rptr. 278]; Perrett v. Southern Pac. Co, 73 Cal. App. 2d 30 [165 P.2d 751].

FN 7. The said instruction read as follows:

" 'When the evidence is contradictory, the decision must be made according to the preponderance of evidence, by which is meant such evidence as, when weighed with that opposed to it, has more convincing force, and from which it results that the greater probability of truth lies therein. Should the conflicting evidence be evenly balanced in your minds, so that you are unable to say that the evidence on either side of the issue preponderates, then your finding must be against the party carrying the burden of proof, namely, the one who asserts the affirmative of the issue.' " (Pp. 165-166.)

FN 8. That is, to establish the defense of contributory negligence.

FN 9. This terminology appears in the instructions given by the court in the present case. See footnote 4, instructions (c) and (d).

FN 10. Mrs. McAnaw was an employee-secretary of respondent corporation.

FN 11. The proposed instruction was as follows:

"The designation of a party in a contract as an independent contractor is not conclusive. Although a contract is drawn with the purpose of creating the appearance of an independent contractor relationship, nevertheless the conduct of the parties to the contract may show that the true relationship between the parties was that of principal and agent. In considering the contract between Mr. Shugg and defendant, Davis Realty Company, you must consider not only the terms of the contract, but also the circumstances under which it was made and the conduct of the parties under the contract. If the true relationship between the parties was that of principal and agent, then Davis Realty Company could not avoid responsibility for the conduct of Mr. Shugg merely by providing in the contract that he was not an employee of the company."

FN 12. It appears to us, however, that the word "should" is preferable to the word "must" because the latter may be interpreted as signifying compulsion rather than the more appropriate idea of bounden duty.

FN 13. All section references herein relate to the Business and Professions Code unless otherwise noted.

FN 14. At the time pertinent to the instant case section 10132 read as follows:

"A real estate salesman within the meaning of this part is a natural person who, for a compensation or in expectation of a compensation, is employed by a licensed real estate broker to sell, or offer for sale, or to list, or to buy, or to offer to buy, or to negotiate the purchase or sale or exchange of real estate, or to solicit the prospective purchasers of real estate, or to solicit borrowers or lenders for or negotiate a loan on real estate, or to lease, or to negotiate the sale, purchase or exchange of leases, or offer to lease, rent or place for rent, any real estate, or improvements thereon." (This section read substantially the same when discussed by Grand v. Griesinger, 160 Cal. App. 2d 397, 405 [325 P.2d 475]. It should be noted that in 1961 this section was amended to provide that a salesman can do any of the acts which a real estate broker may do.)

FN 15. The contemplated detour for lunch thus involved a distance of two blocks from a direct route to his destination at 38th Avenue and Clement Street.

FN 16. The accident took place at 26th Avenue and Clement Street and prior to reaching his home or his ultimate destination.

FN 17. "The liability of a principal for the conduct of its agent is not necessarily terminated by the fact that the agent is combining a private purpose of his own with the business of

his principal. Where the agent is combining his own business with that of his principal, or is attending to both at substantially the same time, the principal is held responsible for the agent's conduct unless it clearly appears that the agent could not have been serving his principal directly or indirectly."

FN 18. The proposed instruction bears the judge's notation "Given as Modified," however, it was not given by the court. By this notation, the court apparently meant to indicate that the substance of this instruction was included in other instructions given. The following instruction submitted by the appellants was given: "When an agent is in truth acting on his principal's behalf and within the scope of his authority, if while so engaged, he also and incidentally attends to some matter strictly personal to himself, his doing so does not break the agency relation so as to release the principal from responsibility for the agent's conduct. On the other hand, when an agent departs from the business or service that has been assigned to him expressly or impliedly by his principal, and pursues some activity or object not for his principal and not reasonably embraced within his employment, but for the agent's own pleasure or purpose, the principal is not responsible for anything done or not done, in such activity."

FN 19. The proposed instruction No. 10 read as follows:

"An employee driving his own car to a meal is not acting in the course and scope of his employment even though he is traveling with the intention of resuming his duties after eating."

# IV. Independent Contractor Agreement

# INDEPENDENT CONTRACTOR AGREEMENT

X Agent's Name: _Penny Taylor_

X Agent's Social Security Number: _____

Licensee's Name: _MRM MANAGEMENT, INC_

Market Center Trade Name: _KELLER WILLIAMS REALTY_

Market Center No.: _199_

Market Center Address: _1927 LOHMANS CROSSING_
_AUSTIN, TX 78734_

Agreement Date: _APR. 24, 2007_

## 1. Engagement

This Agreement is entered into on the date shown above between the Agent and Licensee identified above. Subject to the terms and conditions of this Agreement, Licensee engages Agent as an independent contractor to assist clients of the Market Center with the purchase and sale of real estate. Agent accepts the engagement and agrees to provide the services of a real estate agent (salesperson) to clients of the Market Center in the manner and subject to the conditions this Agreement provides.

## 2. General Terms of Engagement

A.  Agent understands that he or she is entering into this Agreement as an independent contractor and not as an employee. Licensee will have no responsibility to withhold or pay any income or other taxes on Agent's compensation or to provide any insurance, retirement or other employee benefits to Agent. Agent's independent contractor status will define the parties' relationship despite any contrary designation that appears on Agent's real estate license.

B.  Agent will be free to determine his or her own business hours and to choose his or her own target clients, marketing techniques and sales methods. However, Agent agrees to conduct business in compliance with the standards of Agent conduct prescribed by Keller Williams Realty, Inc. ("Keller Williams"); with local, state and federal laws that govern real estate brokerage; and with the By-Laws and Codes of Ethics of each trade or professional organization of which Agent or Licensee is a member. Without limiting the generality of these commitments, Agent agrees:

(1)  to comply with all laws and all Keller Williams Policies and Guidelines that apply to the dissemination of unsolicited e-mail ("spam") and faxes and to the use of telephone calls to market Agent's services or to solicit listings or prospective buyers;

DALLAS2 982760v7 J0416-00003

(2)     to adhere to and comply with the Privacy Policy that Keller Williams publishes from time to time for the www.kw.com website and with the terms of use that Keller Williams prescribes from time to time for the Keller Williams Intranet; and

(3)     to adhere to and comply with Keller Williams' guidelines and restrictions that apply (i) to the registration, ownership and use of domain names for websites that display the Keller Williams trademarks or logo, (ii) to the display and use of the Keller Williams name, trademarks and logo on the Internet, and (iii) to the use of metatags and other devices that attract Internet search engines to such websites.

C.     During the entire time that Agent remains with the Market Center, Agent agrees to list all real estate listings that Agent obtains and to handle all real estate transactions in which Agent engages in the name of KELLER WILLIAMS REALTY.

D.     Agent agrees not to do anything by action, conduct, statement or association that might damage the goodwill associated with Keller Williams' name, trademarks or reputation or cause the public to lose confidence in the Keller Williams organization.

E.     Agent will have no authority to incur obligations on Licensee's behalf and promises (1) not to sign any contract, agreement, lease or note in the name of Licensee, (2) not to open or maintain any bank account or investment account in the name of Licensee, and (3) not to endorse for collection or deposit in Agent's personal account any check, money order or other negotiable instrument made payable to Licensee.

3.     Compensation and Expense Allocation

A.     For so long as Agent's association with the Market Center continues, all income earned from Agent's real estate sales activities will be accounted for and disbursed through the Market Center in accordance with Keller Williams' Policies and Guidelines.

B.     Licensee will share the commissions earned on real estate transactions in which Agent represents a Market Center client as buyer or seller in accordance with the commission splitting and capping policies that Licensee offers generally to licensed sales associates of the Market Center. Licensee's current commission splitting and capping policies are described in Schedule 1 to this Agreement. Agent acknowledges that Licensee retains sole discretion to change these policies. Agent's compensation will be payable only from closed transactions, and Agent may not draw or borrow against any compensation payment.

C.     Licensee will pay the following expenses on Agent's behalf: _____
_____
_____. [List the dues, family reunion expenses, and other expenses that you pay for your agents. If you voluntarily pay any of the expenses listed in Section 3.D for your agents, move those items from 3.D to 3.C. If you do not bear any agent expenses, delete this section.]

_INDEPENDENT CONTRACTOR AGREEMENT_                                    Page 2

D.    Agent will be solely responsible for paying the cost of his or her own (1) real estate license fees and occupational taxes, (2) insurance, including errors and omission liability insurance ("E&O Insurance") and auto insurance, (3) transportation, (4) business cards, yard signs, brochures and other marketing materials, (5) entertainment costs, club dues and other expenses incident to the conduct of his/her services as an Agent, (6) Internet website development and maintenance, and (7) certain fees assessed by Keller Williams for a listing on the www.kw.com website, for access to the Keller Williams Intranet and e-mail system and for other benefits of association with the Market Center (collectively, "Participation Fees"). [If you pay any of these expenses for your sales associates, move the appropriate description from 3.D to 3.C.]

E.    Agent agrees that if Agent does not pay required Participation Fees in full when due, Licensee may deduct any unpaid amount from Agent's commissions.

F.    Agent will be eligible to participate in the Keller Williams Profit Sharing program to the same extent and on the same terms as other Keller Williams sales associates. Agent understands that a Keller Williams market center must become profitable before it participates in the Profit Sharing program and that participating sales associates must remain with the Keller Williams organization for a minimum period before their benefits become vested.

4.    Limited Trademark License

For as long as Agent's association with the Market Center continues, Agent has permission to use the KELLER WILLIAMS REALTY name and logo on his or her yard signs, business cards, letterhead and other business forms, subject to Keller Williams' advance approval of the artwork and text. Licensee will arrange for Agent to have a listing on the www.kw.com website, but, without express permission from Keller Williams and compliance with any policies and procedures that Keller Williams imposes, Agent may not use the Keller Williams name or logo on, or in the domain name, URL or metatags of, any website with which Agent is associated or in any Internet advertisement that Agent places. When Agent's association with the Market Center terminates, his or her permission to use the KELLER WILLIAMS REALTY name and logo will unconditionally cease, and Agent must immediately destroy all business forms that associate Agent with the Keller Williams organization and must comply with Keller Williams' guidelines and procedures regarding website abandonment or revisions. If, with Keller Williams' permission, Agent has used any variation of the KELLER WILLIAMS REALTY name or initials in a domain name, Agent will immediately transfer registration of the domain name to Keller Williams without compensation.

5.    E&O Liability Insurance; Indemnification

A.    Agent agrees to obtain and pay for E&O Insurance covering errors and omissions incident to the professional services a real estate sales associate customarily provides. Agent will arrange for Licensee and Keller Williams to be named as additional insureds in Agent's E&O

DALLAS2 912759v7 30416-00005

Insurance policy and to require the insurer to provide Licensee and Keller Williams not less than 30 days' notice of the policy's cancellation or non-renewal.

B. For purposes of Sections 5.C and 5.D, "Liability" means all liability, claims, damages, losses, costs and expenses that a party sustains or incurs as a result of or in connection with a particular incident or situation.

C. If and to the extent Agent fails to protect Licensee and Keller Williams against risks customarily covered by E&O insurance, Agent agrees to indemnify and hold Licensee and Keller Williams harmless from and against all Liability that Licensee or Keller Williams incurs or suffers on account of Agent's intentional disregard or breach of any law, regulation or standard of conduct that applies to Agent's actions or activities as a licensed real estate sales associate.

D. For risks not customarily covered by E&O insurance and for Liability arising from Agent's negligent (unintentional) disregard or breach of any law, regulation or standard of conduct that applies to Agent's actions or activities as a licensed real estate sales associate, Agent agrees to indemnify and hold Licensee and Keller Williams harmless from and against that percentage of any Liability that equals the percentage of commissions payable to Agent on the date the incident or omission that gave rise to the Liability occurred.

6. Restrictive Covenants and Confidential Information

A. Licensee recognizes and agrees that all customer names and profiles that Agent possesses at the relationship's inception or personally develops during the time Agent is associated with the Market Center (collectively, "Agent's Data") constitute valuable business assets of Agent that are entitled to protection as confidential information. Licensee promises that it will not, during the time of Agent's association with the Market Center or at any later time, attempt to obtain or exploit Agent's Data and will not attempt to stop Agent from taking his or her Agent's Data when his or her relationship with the Market Center ends.

B. Agent recognizes that Licensee and other Market Center agents have spent substantial time, effort, and money to develop the Market Center's customer base and agent team. Except for Agent's Data, which is not covered by this Section 6.B, the names and profiles of customers who have bought or sold real estate through the Market Center and of agents who are associated with the Market Center constitute valuable business assets of Licensee or other agents that are entitled to protection as confidential information. Agent promises that he or she will not, during the time of Agent's association with the Market Center or at any later time, divulge, sell, exchange or distribute to any person except Licensee, other agents associated with the Market Center or, with Licensee's permission, other members of the Keller Williams organization the identities or profiles of any person who has bought or sold real estate through the Market Center or of any agent that Licensee has recruited to the Market Center. Further, Agent promises not to contact any such customer or agent or to use any such profiles except in connection with the business of the Market Center.

_INDEPENDENT CONTRACTOR AGREEMENT_                                          _Page 4_

DALLAS? 982760v7 30416-00003

## 7. Term and Termination

A.    Agent's association with the Market Center will continue for an indefinite period. Either Agent or Licensee may terminate Agent's association with the Market Center at any time, with or without cause or prior notice.

B.    Termination of Agent's association with the Market Center will not terminate any of the continuing rights or obligations of either Agent or Licensee under this Agreement, particularly the covenants in Section 6.

C.    When Agent's association with the Market Center terminates for any reason, Licensee will release and allow Agent to take all solo listings and buyer agency contracts that Agent was responsible for obtaining. If Agent shares listings or agency contracts with other agents in the Market Center, the listings or agency contracts will remain with the Market Center, but Agent will receive his or her full share of the related commission when a sale of the property closes.

D.    After Agent's association with the Market Center terminates, Licensee will continue to pay Agent's commissions on closed transactions in accordance with the commission splitting/capping policies that applied on the date of Agent's termination.

E.    If Agent owes Licensee any Participation Fees or other amounts at the time Agent's association with the Market Center terminates, or if any amounts become due after termination, Agent authorizes Licensee to deduct the amount due from any commissions or other amounts due Agent until Agent's account with Licensee has been fully paid.

## 8. Representations

A.    Agent represents to Licensee that:

(1)    Agent is duly licensed as a real estate broker or salesperson (a "Real Estate Professional") in the state in which the Market Center is located and that Agent is currently authorized to act as a Real Estate Professional in that state.

(2)    Agent is not now, and has not been within the last five years, a defendant in any lawsuit alleging professional misconduct or violation of any deceptive trade practices/consumer protection law, nor is Agent currently subject to an investigation by a real estate commission or comparable oversight body.

(3)    Agent expressly represents and warrants that Agent is free to associate with the Market Center and that Agent is not bound by a promise or commitment to any other real estate company, agency, association, firm, person or corporation that prohibits or prevents Agent from associating with the Keller Williams organization.

(4)    No representative of Licensee or Keller Williams has represented that Agent can earn a living selling residential real estate business, whether working part-time

DALLAS2 982760v7 30416-00005

or full-time. Agent recognizes that the predominant method of earning income in the Keller Williams organization is through the sale of real estate, and that any recruiting-based income an agent may earn is purely supplemental.

B.     Licensee represents to Agent that Licensee or Licensee's Operating Principal is duly licensed as a real estate broker in the state in which the Market Center is located

9.  Miscellaneous Provisions

A.     If any provision of this Agreement is found to be void or unenforceable by any court or arbitration panel, the finding will have no effect on any other provision of this Agreement, and all other provisions will remain in full force and effect.

B.     This Agreement, including Schedule I and any Policies and Guidelines that Keller Williams issues, constitutes the entire agreement and understanding between the parties and supersedes any prior agreement or understanding relating to the subject matter of this Agreement. No change, amendment or waiver of any provision of this Agreement will be binding unless in writing and signed by both Agent and Licensee.

AGENT:                                    LICENSEE:

_____                MRM MANAGEMENT, INC.

                                          By: _____

                                          Title: TEAM LEADER

DALLAS2 982760v7 39416-00005



# KELLER WILLIAMS.
## R E A L T Y

# INDEPENDENT CONTRACTOR AGREEMENT
# SCHEDULE 1

## AGENT'S COMMISSION SPLIT STRUCTURE:

KELLER WILLIAMS REALTY Lake Travis Market Center (hereinafter referred to as "Keller Williams") offers the following commission structure:

_____ 70% commissions to Agents / 30% to Keller Williams of first $2,000,000 production (up to $18,000 company dollars paid); 100% commissions to Agent after $2,000,000 production until Agent's next anniversary (as determined by date Agent joined Keller Williams).

* The agent's joining month is determined by the month Agent signs all necessary agreements, and Keller Williams receives Agent's TREC Salesman's license.

## OFFICE EXPENSES:

Some business expenses (ie. monthly copy charges, private office rent, voicemail, transaction fees, etc.) will be billed to Agent by Keller Williams on a monthly basis. All amounts owed to Keller Williams are due in full by the 25th day of each month. If the bill is not paid by this date, a $25.00 fine will be issued to the account. There will also be a $5.00 per day fee added, after the 25th of the month until the bill is paid in full. If the bill becomes 30 days late, Agent hereby authorizes Keller Williams to deduct the total amount of the bill, including all late fees, from outstanding commissions until the bill is paid in full. When an account reaches 60 days late, if there are no commissions from which to seize funds, voicemail and copy card privileges will be turned off.

Once an agent has reached their cap ($2,000,000 in production, as described above), they will be billed a $25.00 transaction fee for each transaction that closes, for the remainder of that anniversary year. Also, Cap paying agents are responsible for any of their Buyer's Agents and Assistant's bills.

In the event either party for any reason terminates Agent's Independent Contractor status with Keller Williams, Agent authorizes Keller Williams to deduct from outstanding commissions, all amounts owed at the time of the termination of this agreement. Agent also authorizes Keller Williams to deduct all amounts incurred by agent after such date, when those amounts are incurred on behalf of Agent by Keller Williams (ie. ABOR charges, fines/penalties). Any commission income that is seized by Keller Williams to satisfy monies owed Keller Williams will be fully documented and detailed in Agent's Independent Contractor file. Copies of this documentation shall be supplied upon request.

Executed this _24_ day of _April_ _2007_ (year).

Agent's Signature _____ Agent's Printed Name _Penny Taylor_

Manager Signature _____

# V.  Keller Williams Policies and Guidelines

# KELLERWILLIAMS.

## United States and Canada

# Policies & Guidelines Manual

**Revision 4/1/15**

Exhibit ___9___
Witness ___Tenant___
Date ___7-28-16___
Kelly Fisher, CSR

Copyright ©2015 Keller Williams Realty, Inc. All rights reserved.

 

# Pages Market Center Must Update

The following pages must be updated by each Market Center. To update all pages but the Ethics, Market Centers enter the appropriate values in the indicated fields. The Code of Ethics should be printed by the Market Center and inserted into the Policies and Guidelines Manual where indicated.

Commission Splits................................................................................................4-24
Administrative Fee for Capped Associate.................... .... ........................... 4-24
Market Center Hours ............................................................................................4-28
Personal Real Estate (Buying, Selling and Leasing).....................................4-29
Unpaid Bills.......................................................................... ...................,........4-33
Insurance........................................................... ..... .....................................4-41
Personal Real Estate: Buying, Selling and Leasing ............... ...................4-42
National Code of Ethics/Standards of Practice.............................................G-1
Commission Policy of a Market Center ................................... , ....................H-1
Miscellaneous Policies & Fees of a Market Center ........................................I-1
Agency Policy of a Market Center .....................................................................J-1
Policies for Teams and Groups of a Market Center ......................................K-1

# Welcome to Keller Williams

We are proud you have joined our firm and we are excited to be your partner in building your career Keller Williams Realty Inc. s a c mpany led by successful people, for successful people which offers many opportunities for career growth and development.

Quite simply, the Keller W lliams goal s to help you build the strongest real estate business in your marke We want to associate interdependently with the exceptional real estate sales people in our industry.

What makes Keller Williams un que is our ocus on who is our ust mer and partner—you. This focal point sets the tone for everything we do, from how decisions a e made, to our compensation opportunities. Fverything about Keller Williams s un que because the company s bu lt around what our associates believe is best for the r careers. We believe results come through people and that opportun ties abound when careers are bu lt on this philosophical foundation We believe that if the company develops the ndiv dual, then the individual develops the company.

We are more than a real estate company. We are a culture and a belief system in action. We are REALTORS® who through the daily operation of our own successful company, discovered a better way of runn ng a real estate company. We uncovered a better way of life for ourselves and our associates. Our dollars are invested right beside yours—and we are dedicated, just as you are, to providing the best service to all buyers and sellers.

I encourage you to "talk the talk, walk the walk, and live the life" of the Keller Williams way of doing business. We are committed to support, and help to assure, the professional and

# Section 1
# How to Use Your Manual Effectively

This manual has been specifically designed for you! In order to work "interdependently" together we must make sure everyone understands our policies and guidelines.

## 1.1    Definition of Interdependent

"On the maturity continuum, dependence is the paradigm of you—you take care of me; you come through for me; you didn't come through for me; I blame you for the results.

*Independence* is the paradigm of I—I can do it; I am responsible; I am self-reliant; I can choose.

Interdependence is the paradigm of *we—we* can do it; *we* can cooperate; *we* can combine our talents and abilities and create something greater together."[1]

## 1.2    About This Manual

Your manual is divided into the following sections:

*   Keller Williams Story and Philosophy

    Keller Williams began as one dream and its success led to another. This section shares the beginning of the company and its philosophies. By studying this section you will become familiar with our history and philosophy and be able to share it and apply it to your own business.

*   Keller Williams Belief System In Action

    Keller Williams is the result of an inspired vision. The company incorporates an incomparable set of beliefs found in no other real estate company. With the belief system shared in this section, Keller Williams shows it has established its own vision and direction for the future.

*   Keller Williams Policies and Guidelines

    Keller Williams is led by associates, for our associates! Every policy and guideline in this manual has been created and reviewed by our Associate Leadership Councils (Local, City, Regional, and International) and helps to insure professionalism and fairness in our company. Its number one goal is to empower us to develop market dominating businesses. Our ALC will regularly review these policies and encourage you to learn them and share them proudly with other associates, buyers and sellers. These policies and guidelines guarantee all of us an interdependent organization of tremendous creativity, high standards and ethics.

*   Keller Williams Risk Management System

---

[1] *The 7 Habits of Highly Effective People* by Stephen R. Covey

Minimizing your exposure to complaints and potential lawsuits through risk management is the Keller Williams way. This section outlines our simple three-step program which will aid you in effectively managing potential risks encountered in your real estate business.

- Keller Williams Overview of Costs to Associates

  This section discusses your possible business expenses. Most businesses fail, not because they don't make enough money, but because they spend too much! Please always remember this and invest carefully when spending money on your business expenses.

- Keller Williams Referral Procedures

- Keller Williams Recognition Program

- Addenda

# Section 2
# The Keller Williams Story and Philosophy

Kelle Williams is the result of an inspired v sion. Our talented team of associates who created Keller Williams were charged with a monumental goal: "Create the industry's finest nterdependent real estate company."

## 2.1 The Keller Williams Story: A Convergence of Ideals

Today more than any other time in real estate history agent and broker goals seem to be diametrically opposed.

Real estate agents require their commission programs to be exceedingly high, yet brokers a e becoming more and more aware that th s presents a true profitability squeeze Two people can't save the same dollar

### 2.1.1 Solving a Riddle

Gary Keller and Joe Williams established Keller Williams in 1983 as a traditional real estate company. The firm had grown to over 30 associates by 1986. Due to the pressures from 100 percent concepts, they found themselves faced with the above mentioned commission-profitability paradox. Their interdependent approach was a creative and team-oriented response to this riddle.

### 2.1.2 No Compromise Approach

Gary and Joe invited their associates to a meeting where they outlined the commission-profitability squeeze paradox; however, both broker and associate determined that neither was willing to compromise their earning potential. The resulting unanimous solution combined the best of all worlds with a progressive approach. Rather than compromise associate and broker goals the team incorporated the two. The result—the office grew to over 100 associates in less than five months. Few would argue that the inventive Keller Williams programs they designed are some of the biggest advances industry-wide in broker-associate relationships and income opportunities.

### 2.1.3 Combining the Incompatible

The desire to engineer a truly win-win company with no limits on associate career and income opportunities led the reasons for the change. The Keller Williams Team discovered a way to champion the highest possible commission structure within a full support environment with expansive profit potentials for the broker and associate. By doing so they created a method for combining the incompatible—achieving both associate and broker career and income goals. They then went one step further by advocating the concept that a commission program would be just one form of compensation associates would have—not the only one.

### 2.1.4  Unexpected Demand

The Keller Williams System became a triumph. Keller Williams associates asked the firm to expand their opportunities by offering the system to brokers in other cities. In fact, the first affiliate broker was brought in by a associate. The San Antonio Market Center was so successful its first year they received the r Chamber s rido in Progress" award for being the area's fastest growing new business.

The resulting demand for the Keller Williams System was unexpected and as a result Keller Williams did not emerge overnight. The entire company is the result of a massive commitment. It was a commitment from a highly successful group of real estate associates and brokers.

And it was a commitment of time—the time to develop the best, to reject any shortcoming and to rethink, redo and continuously perfect a system policy or program until it was right for Keller Williams and its associates.

After this extensive benchmarking and trending development experience, Keller Williams created a new evol of real estate company. Your company!

## 2.2  The Keller Williams Philosophy

If the company successfully develops its associates, then its associates will successfully develop the company.

### 2.2.1  An End to Compromise Between Broker and Associate

What makes this task so significant s the realization that compromise is inherent in so many real estate companies. For instance, high commission plans usually mean no support, no education and no team environment. Superior support, education and team environment usually lead to low commission plans. Neither compromise creates a win-win company.

Keller Williams is interdependently designed to put all of these compromises to rest. Keller Williams incorporates an incomparable set of concepts found in no other real estate company.

### 2.2.2  A Clear Mission

Keller Williams has developed a clear sense of its own vision and direction for the future.

Keller Williams is a training and consulting company that also provides the franchise systems, products and services which lead to productivity and profitability.

Keller Williams thinks like a top producer, acts like a trainer/consultant and focuses all its activities on productivity and profitability.

IV. Institutional and Promotional Media Advertising

V. Relocation and Referral

VI. Ancillary Business Opportunities

VII. Recognition

VIII. Communication

IX. Marketing and Customer Programs

X. Compensation and Income Opportunities

Through this process, Keller Williams turns the products and services recommendation and quality control process over to its associates and affiliate brokers. The process provides marketplace feedback and the direction needed to develop effective business tools when they're needed. It's part of the culture. Always has been—always will be.

## 2.2.9 World-Class Image

Keller Williams Realty is one of the most recognized brands in the real estate industry because of the education, training and technology offered to our associates. However, when it comes to local branding, the company strongly believes that it is the associates' brands that matter most. Building and maintaining a powerful, locally relevant brand is the most important strategy for an associate.

Even the National Association of REALTORS® has released research that proves that consumers do business with the real estate professional that they like and trust—not companies or big, heavily-advertised brands. An office, a Region and even KWRI, always take a back seat to the associate's brand

## 2.2.10 Tailor-Made Education

Keller Williams Realty is a training and coaching company that also happens to be in the business of real estate. Through its training division, Keller Williams University; online portal, KW Connect, and its coaching division, MAPS Coaching, Keller Williams associates have access to high quality education during every stage of their career. A brand new associate to an experienced mega associate can find the right training and coaching opportunities to propel the   career to the next level.

## 2.2.11 Local and Regional

Contrary to most, Keller Williams views  the real estate industry as a local and regional business. For th s reason, it has taken unprecedented measures to design the firm as a team of regional operat ons. In turn  the goal of each Region is to become a major regional power by build ng major real estate forces in local markets.

This strategy endows our associates with the strongest possible support system in the industry. Everyone wins.

## 2.2.12   A True System

In the Market Center, Keller Williams has created the industry's strongest long term economic model time tested and proven. This was achieved only after thorough research and practical experience.

For many years there were only two major real estate office economic models— traditional and 100 percent–desk fee. After investigating both systems carefully Keller Williams associates chose to take the best from both. The result was a better win-win economic model which is a hybrid of the two.

Our associates receive all of the support advantages of "traditional" while gaining more compensation advantages than just a "desk fee" concept. For the broker it provides the lowest financial risk operating system possible within a full-support company. The Keller Williams economic and operating system delivers where others fall short.

## 2.2.13   Get Involved

- Attend orientation and completely read this manual.

- Take part each week in the many educational, support and leadership opportunities available to you.

- GET OUT INTO THE MARKETPLACE, BUILD YOUR OWN MARKET DOMINATING BUSINESS MEMORABLY AND HAVE FUN!

Remember: Support your fellow associates and team and they will support you!

### 4.9.1.11  Complaints/Disputes Involving Other Associates

- Associates who have complaints/disputes against others should immediately direct them to their TL in writing.
- These should never be discussed with other associates or clients.

### 4.9.1.12  Conduct

- **Alcohol Consumption Policy.** We believe that it is unwise to consume alcohol when working. Therefore, it is a guideline of our company that no member of the organization use alcoholic beverages during business hours. No member of our firm should come to their office and/or Market Center during business hours, or off hours, with alcohol on their breath, or to any extent under the influence of alcohol. We consider this to be a strict guideline.

- **Conduct at the Market Center.** Everyone is to be well-behaved and professional at the Market Center at all times. This is an office where professional business is being conducted and you should expect a business-like attitude to be taken. We want everyone to have respect for each other in their daily personal dealings. There should be no vulgar language, cursing or yelling.

- **Cooperation with Other Brokers.** Please be very cooperative with other REALTORS® for they hold the key to a great deal of information. With their help, you can become very successful. We cooperate and live by the spirit of cooperation with all other REALTORS® and brokers. We do not, by any means, want to be arrogant and feel like we can do the job by ourselves. We solicit the cooperation of other REALTORS® at all times for the benefit of our clients.

  It is our policy to share information with other companies and follow a practice of total cooperation. This, of course, does not mean the giving of confidential information, or any matters of that nature, but does involve information concerning properties that are available to all REALTORS® who are interested in dealing with our company in an open, above board manner.

### 4.9.1.13  Contracts

#### 4.9.1.13.1  Presentation to the Seller



- Each contract should be presented to the seller in person, with a complete Seller's Statement and a qualification sheet on the buyer (if you can obtain one).

- Contract presentations are to be made in a professional manner and are to be discussed with the owner realizing that many items other than money go into a contract offer. For example, date of possession could be a determining factor. These are things that are discussed in your training program and must be considered at each contract presentation.

- The seller should be given every opportunity to accept or reject a contract offer.

### 4.9.1.14 Dress Policy

It is important that everyone who associates with and represents Keller Williams Realty do so in a professional manner. Associates should conduct themselves properly in public, keep their car clean, drive courteously and maintain a well-groomed appearance.

Appearance is the single most important impression factor you have. It is important to be well-groomed from a well-kept hairstyle down to one's shoes. We are professionals; your manner and appearance should reflect this at all times. This dress code should include coming into a Market Center on an associate's day off

### 4.9.1.15 Errors and Omissions (E&O)

The E&O premium is determined by the E&O provider.

Market Centers may have the option to

1. Deduct Market Center associate E&O fee from each side (listing or sales) through the Disbursement Authorization into WinMORE System.

2. Bill each associate a Market Center associate E&O fee monthly through the AccountEdge Accounting Program.

### 4.9.1.16 Equipment/Software

### 4.9.1.16.1 Copy Machine

- Copy Machine will include a *Code* mechanism
- A cost per copy will be paid by the associate.

### 4.9.1.16.2 Fax Machine

- Incoming Fax
- Outgoing Fax - cost per page

### 4.9.1.16.3 Other Equipment/Software

Other equipment/software which the ALC may approve to purchase and which may be available in the Market Center.

- Digital camera
- Color copier
- Associate software
- Headsets for prospecting
- Special computers

### 4.9.1.17 Escrow Deposits

- Time is of the essence when depositing earnest money/escrow checks.
- Escrow checks should never be held for any reason once an offer has become a contract.

- All escrow deposits should be immediately turned over to the title company, or other entity named in contract, for deposit or deposited to the Market Center escrow account immediately

### 4.9.1.18 Keeping In Contact with Your Market Center

Keeping in contact with your Market Center is one of the most important responsibilities you have. We suggest you contact your Market Center at least every four or five hours. Always check in when you enter the Center, check out when you leave, state where you are going to be, who you are going to be with, and when you will be in contact again. If you are off, check in with the Market Center at least once, the only exception being if you are out-of-town. If you are going out-of-town, please make the Market Center aware of that fact and designate who will be covering your business in your absence. A phone number where you could be reached n the event of an emergency requiring your attention should be left with the TL.

### 4.9.1.19 Legal Fee Policy

 Legal Fees will be split between the company and the associate according to the way the commission split was or would have been on the transaction.

### 4.9.1.20 Listings

### 4.9.1.20.1 Open/Exclusive Right to Sell

When we have open listings and/or exclusive r ght to sell, we should always have notice in writing from the owner that we will definitely receive a commission if we procure a sale on that property. If we are not the procur ng cause of the sale, then it is not necessary for us to have it in writ ng. **Before we show any property or give any information, we should have in writing that we will definitely be paid a commission by the owner.**

### 4.9.1.20.2 Contact with Sellers

You should contact the seller of each of your listings **at least once a week.** This will keep the sellers abreast of all the market activity and any activ ty on their houses. One out of each four contacts should be in person! This must be one of our strongest areas; **never leave our sellers stranded!** Our reputation s built on this guideline!

### 4.9.1.20.3 Listing/Sales Files

There is a real necessity for complete records to be kept and recorded so that records of transactions being participated in by the company and the company's associates will be available. All records that have to do with listings, appraisals, leases, the hope of obtaining listings, contracts that have gone through as well as offers or contracts that have fallen through are to be kept in a file. Copies of all letters, contracts and agreements pertaining to real estate, regardless of whether they are written by our associates or others, shall be placed in the file. **This is the only protection you and the company have in the event of a lawsuit. Full knowledge of every case is important. There is no excuse for the violation of this guideline by any associate.**

#### 4.9.1.20.4 Changes on Listings

It is the associate's responsibility to make note of all changes on his/her listings in the Market Center listing filing system and in the Multiple Listing Service (MLS). If the change is of a material nature, the listing associate should have written authorization from the seller and put it in the property file for permanent record. Any fines imposed by the MLS for incorrect or missing information are the responsibility of the associate.

#### 4.9.1.20.5 Listing Forms

It is the responsibility of the listing associate to obtain app oval from his/her TL before submitting a listing to the MLS. It is our policy for you to provide the T with the following information to obtain approval:

- Completed listing form and worksheet

- Completed listing system form

- Initialed seller s statement

This file should be in the Market Center file cabinet and in the Market Center Listing Display Book or Computer, before the listing s put on the listing board and the sign and lock box go up. We understand this will always take coordination, but without following this procedure, problems always occur.

### 4.9.1.21 Market Center Hours



Generally, our Market Centers are open from _____ to _____ Monday through Friday and _____ to _____ Saturday and Sunday. These hours may vary with local practices.

### 4.9.1.22 Market Center Tidiness

Our Market Centers are to be kept neat and clean at all times. Each associate is to make sure the work areas are clean whenever leaving the Market Center. This includes all areas, or areas which everyone has common use of the Market Center.

We hope everyone will take this attitude and keep our Market Centers clean. You should be able to bring anyone into the Market Center at any time and be confident you will be proud of the way it looks.

### 4.9.1.23 Negotiating Commissions

In extreme cases where the seller cannot complete a transaction without the *give and take* of all the parties, you may need to negotiate a commission. All commission negotiations should involve you and your TL, if possible. Try not to ever make a snap decision on any commission negotiation request; time buys a position of strength in each negotiation. The decision is ultimately yours.

### 4.9.1.24 Personal Real Estate (Buying, Selling, and Leasing)

Purchasing or selling real estate (your personal residence or investment properties) is one of the greatest advantages you have as a real estate professional, and it is our goal to preserve this advantage.

1. The associate is not requ red to pay the Market Center a real estate commission on the portion of the transaction that involves the associate as an owner.

a. This provision applies to those properties that are considered personal residences and is limited to two sides per year, one as a Buyer and one as a Seller.

b. Each Market Center will determine how to treat personal transactions beyond two sides per year and those properties classified as something other than personal residences. Each Market Center will also determine required criteria to qualify for this "gift."

> **NOTE:** The associate is required to pay royalty on ALL transactions until the associate fulfills the KWRI royalty cap.

2. The associate is required to pay the Market Center a real estate commission on the side of the transaction that involves another associate.

3. It is Market Center policy to charge the associate a minimal transaction fee of _____ _____. (Check with the Market Center TL.)

4. The associate must pay the E&O insurance if the E&O carrier does insure associate personal transactions.

5. The Market Center must have a copy of the contract on the date it becomes effective, as the Market Center is legally liable.

6. All expenses involved in the marketing of an associate's real estate shall be at the associate's expense.

 7. Certain federal, state or provincial laws and restrictions may apply to investment properties and/or personal residences.

 8. Each associate should obtain a copy of his or her local Market Center policy to determine if there is a minimum company dollar contribution which must be maintained before personal properties can qualify without paying the company a portion of the commission.

### 4.9.1.25   Phone Policy

- All phone calls should be returned as soon as possible

- All long distance calls are the responsibility of and are to be paid for by the Associates placing or authorizing the call

- Policies for any Call Coordinator System or any Phone Opportunity Time System should be developed in conjunction with the Local ALC

### 4.9.1.26   Priorities

 It is the consensus of the ALC that priorities for Keller Williams Realty should always be:

1. Selling real estate

2. Highest possible commission split.

3. Broker profit and a world class environment and organization.

4. Profit sharing to associates and the creation of a vesting type income, not related to personal sales production.

5. A productivity specific environment.

# Addendum A
# Keller Williams Realty Profit Share
# Accounting Policies and Guidelines

The following are the guidelines used in reviewing Keller Williams Market Center accounting reports:

## A.1  Accounts Receivable

All associates are to pay their Market Center bill by the end of each month resulting in a $0 (or credit) balance. A $0 (or credit) AR balance occurs only when all AR has been paid in full. The MC may not force a $0 AR balance through accounting adjustments. The MC will establish policies on late office bills and Late Fees which could result in the returning of a real estate license. The MC will send demand letters via certified mail, "return receipt requested", to all associates with invoices 90 days or more past due. If still unpaid, the MC will write off invoices as Bad Debt Expense.

**Accounts Receivable between Market Centers** are not allowed. These entries are in the form of loans documented with a signed note (including terms for interest) OR paid in full by the end of the month.

## A.2  Auto Expense

Should not exceed $100 per month.

## A.3  Cash

**Operating Bank Account** signatures should include the TL and Operating Principal only. It is highly recommended that the MCA not be on the signature card because of a potential conflict of interest or liability

# VI. Listing Agreement



# RESIDENTIAL REAL ESTATE LISTING AGREEMENT
## EXCLUSIVE RIGHT TO SELL

USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of REALTORS®, Inc. 2014

1. **PARTIES:** The parties to this agreement (this Listing) are:

    Seller: _REGINALD M. TAYLOR_

    Address: _134 BURGESS LN_
    City, State, Zip: _Austin TX 78738_
    Phone: _512-922-7277_ Fax: _____
    E-Mail: _RMTaylor @ SwBell.NEt_

    Broker: _Keller Williams Realty Penny Hunsinger Taylor_
    Address: _1921 Lohmans Crossing Ste 100_
    City, State, Zip: _Lakeway TX 78734_
    Phone: _____ Fax: _____
    E-Mail: _____

    Seller appoints Broker as Seller's sole and exclusive real estate agent and grants to Broker the exclusive right to sell the Property.

2. **PROPERTY:** "Property" means the land, improvements, and accessories described below, except for any described exclusions.

    A. Land: Lot _17_, Block _D Olt 14 Division B_
    _Homewood Heights_ Addition, City of _Austin_,
    in _Travis_ County, Texas known as _2705 Crest Ave Austin TX 78703_ (address/zip code),
    or as described on attached exhibit. (If Property is a condominium, attach Condominium Addendum.)

    B. **Improvements:** The house, garage and all other fixtures and improvements attached to the above-described real property, including without limitation, the following permanently installed and built-in items, if any: all equipment and appliances, valances, screens, shutters, awnings, wall-to-wall carpeting, mirrors, ceiling fans, attic fans, mail boxes, television antennas and satellite dish system and equipment, mounts and brackets for televisions and speakers, heating and air-conditioning units, security and fire detection equipment, wiring, plumbing and lighting fixtures, chandeliers, water softener system, kitchen equipment, garage door openers, cleaning equipment, shrubbery, landscaping, outdoor cooking equipment, and all other property owned by Seller and attached to the above-described real property.

    C. **Accessories:** The following described related accessories, if any: window air conditioning units, stove, fireplace screens, curtains and rods, blinds, window shades, draperies and rods, door keys, mailbox keys, above-ground pool, swimming pool equipment and maintenance accessories, artificial fireplace logs, and controls for: (i) satellite dish systems, (ii) garage doors, (iii) entry gates, and (iv) other improvements and accessories.

(TAR-1101) 01-01-14    Initialed for Identification by Broker/Associate _____ and Seller _____    Page 1 of 10

Exhibit _S_
Witness _Taylor_
Date _7-28-16_
Kelly Fisher, CSR

DEF 604

compensation Broker may receive under this Listing.

(3) Other Fees and/or Reimbursable Expenses: _____
_____
_____

E   Protection Period:

(1) "Protection period" means that time starting the day after this Listing ends and continuing for __10__ days. "Sell" means any transfer of any fee simple interest in the Property whether by oral or written agreement or option.

(2) Not later than 10 days after this Listing ends, Broker may send Seller written notice specifying the names of persons whose attention was called to the Property during this Listing. If Seller agrees to sell the Property during the protection period to a person named in the notice or to a relative of a person named in the notice, Seller will pay Broker, upon the closing of the sale, the amount Broker would have been entitled to receive if this Listing were still in effect.

---

Residential Listing concerning _____ 2705   Clese Ave  Austin Tx 78702

D. Exclusions: The following improvements and accessories will be retained by Seller and must be removed prior to delivery of possession. one Window Ac Unit, Refridgerator, Stove, washer and Dryer

E   Owners' Association: The property ☐ is ☒ is not subject to mandatory membership in a property owners' association

3. LISTING PRICE: Seller instructs Broker to market the Property at the following price: $ _____ (Listing Price). Seller agrees to sell the Property for the Listing Price or any other price acceptable to Seller. Seller will pay all typical closing costs charged to sellers of residential real estate in Texas (seller's typical closing costs are those set forth in the residential contract forms promulgated by the Texas Real Estate Commission).

4. TERM:

A. This Listing begins on ___ June 1 2015 and ends at 11:59 p.m. on ___ Sept 1 2015.

B. If Seller enters into a binding written contract to sell the Property before the date this Listing begins and the contract is binding on the date this Listing begins, this Listing will not commence and will be void.

5. BROKER'S COMPENSATION:

A. When earned and payable, Seller will pay Broker:

☒ (1) ___6___ % of the sales price.

☐ (2) _____.

B. Earned: Broker's compensation is earned when any one of the following occurs during this Listing:
(1) Seller sells, exchanges, options, agrees to sell, agrees to exchange, or agrees to option the Property to anyone at any price on any terms;
(2) Broker individually or in cooperation with another broker procures a buyer ready, willing, and able to buy the Property at the Listing Price or at any other price acceptable to Seller; or
(3) Seller breaches this Listing.

C. Payable: Once earned, Broker's compensation is payable either during this Listing or after it ends at the earlier of:
(1) the closing and funding of any sale or exchange of all or part of the Property;
(2) Seller's refusal to sell the Property after Broker's compensation has been earned;
(3) Seller's breach of this Listing; or
(4) at such time as otherwise set forth in this Listing.

Broker's compensation is not payable if a sale of the Property does not close or fund as a result of: (i) Seller's failure, without fault of Seller, to deliver to a buyer a deed or a title policy as required by the contract to sell; (ii) loss of ownership due to foreclosure or other legal proceeding; or (iii) Seller's failure to restore the Property, as a result of a casualty loss, to its previous condition by the closing date set forth in a contract for the sale of the Property.

D. Other Compensation:

(1) Breach by Buyer Under a Contract: If Seller collects earnest money, the sales price, or damages by suit, compromise, settlement, or otherwise from a buyer who breaches a contract for the sale of the Property entered into during this Listing, Seller will pay Broker, after deducting attorney's fees and collection expenses,

(TAR-1101) 01-01-14    Initialed for Identification by Broker/Associate ____ and Seller ____, ____    Page 2 of 10

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

DEF 605

Residential Listing concerning ___2705 Crest Ave Austin Tx 78702___

☐ B. Seller instructs Broker not to file this Listing with one or more Multiple Listing Service (MLS) until _____ days after the date this Listing begins for the following purpose(s): _____

_____

(NOTE. Do not check if prohibited by Multiple Listing Service(s).)

☐ C. Broker will not file this Listing with a Multiple Listing Service (MLS) or any other listing service.

Notice: Seller acknowledges and understands that if this option is checked: (1) Seller's Property will not be included in the MLS database available to real estate agents and brokers from other real estate offices who subscribe to and participate in the MLS, and their buyer clients may not be aware that Seller's Property s offered for sale; (2) Seller's Property will not be included in the MLS's download to various real estate internet sites that are used by the public to search for property listings; and (3) real estate agents, brokers, and members of the public may be unaware of the terms and conditions under which Seller is marketing the Property.

**7. ACCESS TO THE PROPERTY:**

A. Authorizing Access: Authorizing access to the Property means giving permission to another person to enter the Property, disclosing to the other person any security codes necessary to enter the Property, and lending a key to the other person to enter the Property, directly or through a keybox  To facilitate the showing and sale of the Property, Seller instructs Broker to:
(1) access the Property at reasonable times;
(2) authorize other brokers, their associates, inspectors, appraisers, and contractors to access the Property at reasonable times; and
(3) duplicate keys to facilitate convenient and efficient showings of the Property.

B. Scheduling Companies: Broker may engage the following companies to schedule appointments and to authorize others to access the Property: _____

C. Keybox: A keybox is a looked container placed on the Property that holds a key to the Property. A keybox makes it more convenient for brokers, their associates, inspectors, appraisers, and contractors to show, inspect, or repair the Property. The keybox is opened by a special combination, key, or programmed device so that authorized persons may enter the Property, even in Seller's absence. Using a keybox will probably increase the number of showings, but involves risks (for example, unauthorized entry, theft, property damage, or personal injury). Neither the Association of REALTORS® nor MLS requires the use of a keybox.

(1) Broker ☑ is ☐ is not   authorized to place a keybox on the Property.

(2) If a tenant occupies the Property at any time during this Listing, Seller will furnish Broker a written statement (for example, TAR No. 1411), signed by all tenants, authorizing the use of a keybox or Broker may remove the keybox from the Property.

D. Liability and Indemnification: When authorizing access to the Property, Broker, other brokers, their associates, any keybox provider, or any scheduling company are not responsible for personal injury or property loss to Seller or any other person. Seller assumes all risk of any loss, damage, or injury. Except for a loss caused by Broker, Seller will indemnify and hold Broker harmless from any claim for personal injury, property damage, or other loss.

**8. COOPERATION WITH OTHER BROKERS:** Broker will allow other brokers to show the Property to prospective buyers. Broker will offer to pay the other broker a fee as described below if the other broker procures a buyer that purchases the Property.

(TAR-1101) 01-01-14    Initialed for Identification by Broker/Associate _____ and Seller _____    Page 4 of 10

Produced with zipForm® by zipLogix  18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

5123310682     prmtaylor

DEF 606

Residential Listing concerning _2705 Crest AVE Austin Tx 78702_

   A. **MLS Participants** f the other broker is a participant in the MLS in which this Listing is filed, Broker will offer to pay the other broker:
     (1) if the other broker represents the buyer. __3%__ % of the sales price or $ _____ , and
     (2) if the other broker is a subagent: _____ % of the sales price or $ _____ .

   B. **Non-MLS Brokers.** If the other broker is not a participant in the MLS in which this Listing is filed, Broker will offer to pay the other broker:
     (1) if the other broker represents the buyer: __3%__ % of the sales price or $ _____ ; and
     (2) if the other broker is a subagent: _____ % of the sales price or $ _____ .

9. **INTERMEDIARY:** *(Check A or B only.)*

☒ A. **Intermediary Status.** Broker may show the Property to interested prospective buyers who Broker represents. If a prospective buyer who Broker represents offers to buy the Property, Seller authorizes Broker to act as an intermediary and Broker wil notify Seller that Broker will service the parties in accordance with one of the following alternatives.

     (1) If a prospective buyer who Broker represents is serviced by an associate other than the associate servicing Seller under this Listing, Broker may notify Seller that Broker will: (a) appoint the associate then servicing Seller to communicate with, carry out instructions of, and provide opinions and advice during negotiations to Seller and (b) appoint the associate then servicing the prospective buyer to the prospective buyer for the same purpose

     (2) If a prospective buyer who Broker represents is serviced by the same associate who is servicing Seller, Broker may notify Seller that Broker will. (a) appoint another associate to communicate with, carry out instructions of, and provide opinions and advice during negotiations to the prospective buyer; and (b) appoint the associate servicing the Seller under this Listing to the Seller for the same purpose.

     (3) Broker may notify Seller that Broker will make no appointments as described under this Paragraph 9A and, in such an event, the associate servicing the parties will act so ely as Broker's intermediary representative, who may facilitate the transaction but will not render opinions or advice during negotiations to either party

☐ B. **No Intermediary Status** Seller agrees that Broker will not show the Property to prospective buyers who Broker represents.

**Notice:** If Broker acts as an intermediary under Paragraph 9A, Broker and Broker's associates:
- may not disclose to the prospective buyer that Seller will accept a price less than the asking price unless otherwise instructed in a separate writing by Seller;
- may not disclose to Seller that the prospective buyer will pay a price greater than the price submitted in a written offer to Seller unless otherwise instructed in a separate writing by the prospective buyer;
- may not disclose any confidential information or any information Seller or the prospective buyer specifically instructs Broker in writing not to disclose unless otherwise instructed in a separate writing by the respective party or required to disclose the information by the Real Estate License Act or a court order or if the information materially relates to the condition of the property;
- may not treat a party to the transaction dishonestly; and
- may not violate the Real Estate License Act.

(TAR-1101) 01-01-14   Initialed for identification by Broker/Associate _____ and Seller _____   Page 5 of 10

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

Residential Listing concerning _2705 Crest Ave Austin Tx 78702_

**10. CONFIDENTIAL INFORMATION:** During this Listing or after it ends, Broker may not knowingly disclose information obtained in confidence from Seller except as authorized by Seller or required by law. Broker may not disclose to Seller any confidential information regarding any other person Broker represents or previously represented except as required by law.

**11. BROKER'S AUTHORITY:**

A. Broker will use reasonable efforts and act diligently to market the Property for sale, procure a buyer, and negotiate the sale of the Property.

B. Broker is authorized to display this Listing on the Internet without limitation unless one of the following is checked:

☐ (1) Seller does not want this Listing to be displayed on the Internet.
☐ (2) Seller does not want the address of the Property to be displayed on the Internet.

**Notice:** Seller understands and acknowledges that, if box 11B(1) is selected, consumers who conduct searches for listings on the Internet will not see information about this Listing in response to their search.

C. Broker is authorized to market the Property with the following financing options:

☒ (1) Conventional          ☐ (5) Texas Veterans Land Program
☒ (2) VA                    ☐ (6) Owner Financing
☒ (3) FHA                   ☐ (7) Other
☒ (4) Cash

D. In addition to other authority granted by this Listing, Broker may:
(1) advertise the Property by means and methods as Broker determines, including but not limited to creating and placing advertisements with interior and exterior photographic and audio-visual images of the Property and related information in any media and the Internet;
(2) place a "For Sale" sign on the Property and remove all other signs offering the Property for sale or lease;
(3) furnish comparative marketing and sales information about other properties to prospective buyers;
(4) disseminate information about the Property to other brokers and to prospective buyers, including applicable disclosures or notices that Seller is required to make under law or a contract;
(5) obtain information from any holder of a note secured by a lien on the Property;
(6) accept and deposit earnest money in trust in accordance with a contract for the sale of the Property;
(7) disclose the sales price and terms of sale to other brokers, appraisers, or other real estate professionals;
(8) in response to inquiries from prospective buyers and other brokers, disclose whether the Seller is considering more than one offer (Broker will not disclose the terms of any competing offer unless specifically instructed by Seller);
(9) advertise, during or after this Listing ends, that Broker "sold" the Property; and
(10) place information about this Listing, the Property, and a transaction for the Property on an electronic transaction platform (typically an Internet-based system where professionals related to the transaction such as title companies, lenders, and others may receive, view, and input information).

E. Broker is not authorized to execute any document in the name of or on behalf of Seller concerning the Property.

(TAR-1101) 01-01-14    Initialed for Identification by Broker/Associate _____ and Seller _____          Page 6 of 10

5123310682                                                           printaylor

DEF 608

Residential Listing concerning ___2705 Crest Ave Alotin Tx 780__

**12. SELLER'S REPRESENTATIONS:** Except as provided by Paragraph 15, Seller represents that:
  A. Seller has fee simple title to and peaceable possession of the Property and all its improvements and fixtures, unless rented, and the legal capacity to convey the Property;
  B. Seller is not bound by a listing agreement with another broker for the sale, exchange, or lease of the Property that is or will be in effect during this Listing;
  C. any pool or spa and any required enclosures, fences, gates, and latches comply with all applicable laws and ordinances;
  D. no person or entity has any right to purchase, lease, or acquire the Property by an option, right of refusal, or other agreement;
  E. Seller is current and not delinquent on all loans and all other financial obligations related to the Property, including but not limited to mortgages, home equity loans, home improvement loans, homeowner association fees, and taxes, except ___none___;
  F. Seller is not aware of any liens or other encumbrances against the Property, except ___1 mortgage with Ditech___;
  G. the Property is not subject to the jurisdiction of any court;
  H. all information relating to the Property Seller provides to Broker is true and correct to the best of Seller's knowledge; and
  I. the name of any employer, relocation company, or other entity that provides benefits to Seller when selling the Property is: _____.

**13. SELLER'S ADDITIONAL PROMISES:** Seller agrees to:
  A. cooperate with Broker to facilitate the showing, marketing, and sale of the Property;
  B. not rent or lease the Property during this Listing without Broker's prior written approval;
  C. not negotiate with any prospective buyer who may contact Seller directly, but refer all prospective buyers to Broker;
  D. not enter into a listing agreement with another broker for the sale, exchange, lease, or management of the Property to become effective during this Listing without Broker's prior written approval;
  E. maintain any pool and all required enclosures in compliance with all applicable laws and ordinances;
  F. provide Broker with copies of any leases or rental agreements pertaining to the Property and advise Broker of tenants moving in or out of the Property;
  G. complete any disclosures or notices required by law or a contract to sell the Property; and
  H. amend any applicable notices and disclosures if any material change occurs during this Listing.

**14. LIMITATION OF LIABILITY:**

  A. If the Property is or becomes vacant during this Listing, Seller must notify Seller's casualty insurance company and request a "vacancy clause" to cover the Property. Broker is not responsible for the security of the Property nor for inspecting the Property on any periodic basis.

  B. Broker is not responsible or liable in any manner for personal injury to any person or for loss or damage to any person's real or personal property resulting from any act or omission not caused by Broker's negligence, including but not limited to injuries or damages caused by:
  (1) other brokers, their associates, inspectors, appraisers, and contractors who are authorized to access the Property;
  (2) other brokers or their associates who may have information about the Property on their websites;
  (3) acts of third parties (for example, vandalism or theft);
  (4) freezing water pipes;
  (5) a dangerous condition on the Property;
  (6) the Property's non-compliance with any law or ordinance; or
  (7) Seller, negligently or otherwise.

(TAR-1101) 01-01-14    Initialed for Identification by Broker/Associate ___ and Seller ___    Page 7 of 10

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser  Michigan 48026  www.zipLogix.com

5123310682    pmtaylor    DEF 609

Residential Listing concerning ___2705 Crest Ave Austin Tx 78702___

C. Seller agrees to protect, defend, indemnify, and hold Broker harmless from any damage, costs, attorney's fees, and expenses that:
   (1) are caused by Seller, negligently or otherwise;
   (2) arise from Seller's failure to disclose any material or relevant information about the Property; or
   (3) are caused by Seller giving incorrect information to any person.

**15. SPECIAL PROVISIONS:**

**16. DEFAULT:** If Seller breaches this Listing, Seller is in default and will be liable to Broker for the amount of the Broker's compensation specified in Paragraph 5A and any other compensation Broker is entitled to receive under this Listing. If a sales price is not determinable in the event of an exchange or breach of this Listing, the Listing Price will be the sales price for purposes of computing compensation. If Broker breaches this Listing, Broker is in default and Seller may exercise any remedy at law.

**17. MEDIATION:** The parties agree to negotiate in good faith in an effort to resolve any dispute related to this Listing that may arise between the parties. If the dispute cannot be resolved by negotiation, the dispute will be submitted to mediation. The parties to the dispute will choose a mutually acceptable mediator and will share the cost of mediation equally.

**18. ATTORNEY'S FEES:** If Seller or Broker is a prevailing party in any legal proceeding brought as a result of a dispute under this Listing or any transaction related to or contemplated by this Listing, such party will be entitled to recover from the non-prevailing party all costs of such proceeding and reasonable attorney's fees.

**19. ADDENDA AND OTHER DOCUMENTS:** Addenda that are part of this Listing and other documents that Seller may need to provide are:
- ☒ A. Information About Brokerage Services;
- ☒ B. Seller Disclosure Notice (§5.008, Texas Property Code);
- ☐ C. Addendum for Seller's Disclosure of Information on Lead-Based Paint and Lead-Based Paint Hazards (required if Property was built before 1978);
- ☒ D. Residential Real Property Affidavit (T-47 Affidavit; related to existing survey);
- ☐ E. MUD, Water District, or Statutory Tax District Disclosure Notice (Chapter 49, Texas Water Code);
- ☐ F. Request for Information from an Owners' Association;
- ☐ G. Request for Mortgage Information;
- ☐ H. Information about Mineral Clauses in Contract Forms;
- ☐ I. Information about On-Site Sewer Facility;
- ☐ J. Information about Property Insurance for a Buyer or Seller;
- ☐ K. Information about Special Flood Hazard Areas;
- ☐ L. Condominium Addendum to Listing;
- ☒ M. Keybox Authorization by Tenant;
- ☐ N. Seller's Authorization to Release and Advertise Certain Information; and
- ☐ O. _____

(TAR-1101) 01-01-14   Initialed for Identification by Broker/Associate _____ and Seller _____   Page 8 of 10

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

5123310862                                                                   prmtaylor

DEF 610

Residential Listing concerning  2705 Crest Ave Austin TX 78782

## 20. AGREEMENT OF PARTIES:

A. <u>Entire Agreement</u>: This Listing is the entire agreement of the parties and may not be changed except by written agreement.

B. <u>Assignability</u>: Neither party may assign this Listing without the written consent of the other party.

C. <u>Binding Effect</u>: Seller's obligation to pay Broker an earned compensation is binding upon Seller and Seller's heirs, administrators, executors, successors, and permitted assignees.

D. <u>Joint and Several</u>: All Sellers executing this Listing are jointly and severally liable for the performance of all its terms.

E. <u>Governing Law</u>: Texas law governs the interpretation, validity, performance, and enforcement of this Listing.

F. <u>Severability</u>: If a court finds any clause in this Listing invalid or unenforceable, the remainder of this Listing will not be affected and all other provisions of this Listing will remain valid and enforceable.

G. <u>Notices</u>: Notices between the parties must be in writing and are effective when sent to the receiving party's address, fax, or e-mail address specified in Paragraph 1.

## 21. ADDITIONAL NOTICES:

A. Broker's compensation or the sharing of compensation between brokers is not fixed, controlled, recommended, suggested, or maintained by the Association of REALTORS®, MLS, or any listing service.

B. In accordance with fair housing laws and the National Association of REALTORS® Code of Ethics, Broker's services must be provided and the Property must be shown and made available to all persons without regard to race, color, religion, national origin, sex, disability, familial status, sexual orientation, or gender identity. Local ordinances may provide for additional protected classes (for example, creed, status as a student, marital status, or age).

C. Broker advises Seller to contact any mortgage lender or other lien holder to obtain information regarding payoff amounts for any existing mortgages or liens on the Property.

D. Broker advises Seller to review the information Broker submits to an MLS or other listing service.

E. Broker advises Seller to remove or secure jewelry, prescription drugs, other valuables, firearms and any other weapons.

F. Statutes or ordinances may regulate certain items on the Property (for example, swimming pools and septic systems). Non-compliance with the statutes or ordinances may delay a transaction and may result in fines, penalties, and liability to Seller.

G. If the Property was built before 1978, Federal law requires the Seller to: (1) provide the buyer with the federally approved pamphlet on lead poisoning prevention; (2) disclose the presence of any known lead-based paint or lead-based paint hazards in the Property; (3) deliver all records and reports to the buyer related to such paint or hazards; and (4) provide the buyer a period up to 10 days to have the Property inspected for such paint or hazards.

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

Residential Listing concerning ___2705 Crest Ack Austin Tx 78702___

H. Broker cannot give legal advice. **READ THIS LISTING CAREFULLY.** If you do not understand the effect of this Listing, consult an attorney BEFORE signing.

Keller Williams        0569795
Broker's Printed Name        License No.

_____        6-1-15
☐ Broker's Signature        Date
☒ Broker's Associate's Signature, as an authorized agent of Broker

Penny Harrington Taylor
Broker's Associate's Printed Name, if applicable

Reginald M Taylor
Seller's Printed Name

Reginald M. Taylor        6-1-15
Seller's Signature        Date

_____
Seller's Printed Name

_____        _____
Seller's Signature        Date

(TAR-1101) 01-01-14     Initialed for Identification by Broker/Associate _____ and Seller _____     Page 10 of 10

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

DEF 612

# VII. Police Report

Law Enforcement and TxDOT Use ONLY

☐ FATAL  ☐ CMV  ☐ SCHOOL BUS  ☐ RAILROAD  ☐ MAB  ☒ SUPPLEMENT  ☐ ACTIVE SCHOOL ZONE

| Total Num. Units | 2 | Total Num. Prsns | 2 | TxDOT Crash ID |
|---|---|---|---|---|

**Texas Peace Officer's Crash Report (Form CR-3 1/1/2015)**
Mail to: Texas Department of Transportation, Crash Data and Analysis, P.O. Box 149349, Austin, TX 78714. Questions? Call 844/274-7457
Refer to Attached Code Sheet for Numbered Fields
*These fields are required on all additional sheets submitted for this crash (ex. additional vehicles, occupants, injured, etc.)

Page 1 of 2

## IDENTIFICATION & LOCATION

| *Crash Date (MM/DD/YYYY): 08/06/2015 | *Crash Time (24HRMM): 14:50 | Case ID: 152181102 | Local Use |
|---|---|---|---|

| *Town Name: TRAVIS | *City Name: AUSTIN | ☐ Outside City Limit |
|---|---|---|

In your opinion, did this crash result in at least $1,000 damage to any one person's property? ☒ Yes ☐ No
Latitude (decimal degrees) | Longitude (decimal degrees)

**ROAD ON WHICH CRASH OCCURRED**

| *1 Rdwy Sys: LR | *Hwy Num | 2 Rdwy Part: 1 | Block Num: 1600 | 3 Street Prefix: E | *Street Name: OLTORF | 4 Street Suffix: ST |
|---|---|---|---|---|---|---|

☐ Crash Occurred on a Private Drive or Road/Private Property/Parking Lot
☐ Toll Road/Toll Lane
Speed Limit: 35
Cnstr Zone: ☐ Yes ☒ No
Workers Present: ☐ Yes ☒ No
Street Desc: CITY STREET

**INTERSECTING ROAD, OR IF CRASH NOT AT INTERSECTION, NEAREST INTERSECTING ROAD OR REFERENCE MARKER**

At Int: ☐ Yes ☒ No | 1 Rdwy Srt: IH | Hwy Num: 35 | 2 Rdwy Part: 2 | Block Num | 3 Street Prefix: S | Street Name: IH 35 | 4 Street Suffix: HWY

Distance from Int or Ref Marker: 100 | ☒ FT ☐ MI | 3 Dir. from Int or Ref Marker: E | Reference Marker | Street Desc: INTERSTATE HIGHWAY | RRX Num

## VEHICLE, DRIVER & PERSONS

| Unit Num: 1 | 5 Unit Desc: 1 | ☐ Parked Vehicle | ☐ Hit and Run | LP State: TX | LP Num: GH22YR | VIN: JNKCV54EX5M424401 |
|---|---|---|---|---|---|---|

| Veh Year: 2005 | 6 Veh Color: BLK | Veh Make: INFINITI | Veh Model: G35 | 7 Body Style: P2 | ☐ Pol, Fire, EMS on Emergency (flashing or Hazard or Attached) |
|---|---|---|---|---|---|

| 8 DL/ID Type: 1 | DL/ID State: TX | DL/ID Num: 06896530 | 9 DL Class: C | 10 CDL End: 96 | 11 DL Rest: 96 | DOB (MM/DD/YYYY): 08/21/1958 |
|---|---|---|---|---|---|---|

Address (Street, City, State, ZIP): 134 BURGESS LANE AUSTIN, TX 78738

| Person Num | 12 Prsn Type | 13 Seat Position | Name: Last, First, Middle (Enter Driver or Primary Person for this Unit on first line) | 14 Injury Severity | Age | 15 Ethnicity | 16 Sex | 17 Ejct | 18 Rest | 19 Airbag | 20 Helmet | 21 Sol | 22 Alc Spec | Alc Result | 23 Drug Spec | 24 Drug Result | 25 Drug Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 1 | TAYLOR, PENNY, HARRINGTON | N | 56 | W | 2 | 1 | 1 | 5 | 97 | N | 96 | | 96 | 97 | 97 |

Not Applicable. Alcohol and Drug Results are only reported for Driver/Primary Person for each Unit

☒ Owner ☐ Lessee  Name & Address: PENNY HARRINGTON TAYLOR 134 BURGESS LANE AUSTIN, TX 78738

Proof of Fin Resp: ☒ Yes ☐ No  ☐ Expired ☐ Exempt  26 Fin Resp Type: 1  Fin Resp Name: STATE FARM SOUTH  Fin Resp Num: U063543D0353T

Fin Resp Phone Num: 8002521932 | 27 Vehicle Damage Rating 1: 9 - LP - 3 | 27 Vehicle Damage Rating 2 | Vehicle Inventoried: ☐ Yes ☒ No

Towed By: SOUTHSIDE WRECKER INC | Towed To: SOUTHSIDE WRECKER INC

| Unit Num: 2 | 5 Unit Desc: 1 | ☐ Parked Vehicle | ☐ Hit and Run | LP State: TX | LP Num: 910F3T | VIN: 1HD1BVB133Y043560 |
|---|---|---|---|---|---|---|

| Veh Year: 2003 | 6 Veh Color: BLK | Veh Make: HARLEY-DAVIDSON | Veh Model: FLHP | 7 Body Style: MC | ☐ Pol, Fire, EMS on Emergency (flashing or Hazard or Attached) |
|---|---|---|---|---|---|

| 8 DL/ID Type: 1 | DL/ID State: TX | DL/ID Num: 22896362 | DL Class: AM | CDL End: 96 | 11 DL Rest: 96 | DOB (MM/DD/YYYY): 04/29/1963 |
|---|---|---|---|---|---|---|

Address (Street, City, State, ZIP): 602 FORM DRUM DR AUSTIN, TX 78745

| Person Num | 12 Prsn Type | 13 Seat Position | Name: Last, First, Middle (Enter Driver or Primary Person for this Unit on first line) | 14 Injury Severity | Age | 15 Ethnicity | 16 Sex | 17 Ejct | 18 Rest | 19 Airbag | 20 Helmet | 21 Sol | 22 Alc Spec | Alc Result | 23 Drug Spec | 24 Drug Result | 25 Drug Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 5 | 2 | STROUP, DOUGLAS, LEE | A | 52 | W | 1 | 97 | 97 | 97 | 1 | N | 96 | | 96 | 97 | 97 |

Not Applicable. Alcohol and Drug Results are only reported for Driver/Primary Person for each Unit

☒ Owner ☐ Lessee  Name & Address: DOUGLAS LEE STROUP 602 FORM DRUM DR AUSTIN, TX 78745

Proof of Fin Resp: ☒ Yes ☐ No  ☐ Expired ☐ Exempt  26 Fin Resp Type: 1  Fin Resp Name: GEICO  Fin Resp Num: 4249247430

Fin Resp Phone Num: 800-861-8380 | 27 Vehicle Damage Rating 1: 12 - FC - 4 | 27 Vehicle Damage Rating 2 | Vehicle Inventoried: ☐ Yes ☒ No

Towed By: SOUTHSIDE WRECKER INC | Towed To: SOUTHSIDE WRECKER INC

Exhibit ___4___
Witness _____Taylor_____
Date _____7-28-16_____
Kelly Fisher, CSR

## DISPOSITION OF INJURED/KILLED

| Unit Num. | Pers. Num. | Taken To | Taken By | Date of Death (MM/DD/YYYY) | Time of Death (24HR MM) |
|---|---|---|---|---|---|
| 2 | 1 | UMC AT BRACKENRIDGE | AUSTIN TRAVIS COUNTY EMS | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## CHARGES

| Unit Num. | Pers. Num. | Charge | Citation/Reference Num. |
|---|---|---|---|
| 1 | 1 | FAIL TO YIELD ROW-PVT DRIVE | 15165416 |
| | | | |
| | | | |

## DAMAGE

| Damaged Property Other Than Vehicles | Owner's Name | Owner's Address |
|---|---|---|
| | | |

## CMV

| Unit Num. | 10,001+ LBS | TRANSPORTING HAZARDOUS MATERIAL | 9+ CAPACITY | CMV Disabling Damage? Yes No | 28 Veh. Oper. | 29 Carrier ID Type | Carrier ID Num | |
|---|---|---|---|---|---|---|---|---|

Carrier's Corp. Name: Carrier's Primary Addr.

| 31 Bus Type | RGVW | GVWR | 34 Trlr Type | CMV Disabling Damage? Yes No | 32 Hazmat Class Num. | Hazmat ID Num. | 33 Cargo Body Style |
|---|---|---|---|---|---|---|---|

| Sequence Of Event | 35 Seq 1 | 35 Seq 2 | 35 Seq 3 | 35 Seq 4 |
|---|---|---|---|---|

## FACTORS & CONDITIONS

| 36 Contributing Factors (Investigator's Opinion) | | | 37 Vehicle Defects (Investigator's Opinion) | | | Environmental and Roadway Conditions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1# | Contributing | May Have Contrib. | Contributing | May Have Contrib. | | 38 Weather Cond | 39 Light Cond | 40 Entering Roads | 41 Roadway Type | 42 Roadway Alignment | 43 Surface Condition | 44 Traffic Control |
| 1 | 34 | | | | | | 1 | 1 | 97 | 2 | 1 | 1 | 11 |

## NARRATIVE AND DIAGRAM

Investigator's Narrative Opinion of What Happened
(Attach Additional Sheets if Necessary)

UNIT #1 WAS PULLING OUT OF PARKING LOT OF MOTEL IN THE 1600 BLK OF E OLTORF ST. UNIT #2 WAS TRAVELING EASBOUND ON OLTORF IN THE OUTSIDE LANE. UNIT #1 FAILED TO YIELD RIGHT OF WAY FROM A PRIVATE DRIVE AND PULLED OUT IN FRONT OF UNIT #2 TO MAKE A LEFT TURN INTO OLTORF. UNIT #2 STRUCK THE LEFT PASSENGER SIDE OF UNIT #1 AT SPEED. RIDER OF UNIT #2 WAS NOT WEARING HELMET AND IMPACTED SIDE OF UNIT #1.

Indicate North

Field Diagram Not to Scale

1600 E OLTORF ST

E OLTORF ST

## INVESTIGATOR

| Time Notified (24HR MM) | 1 4 5 4 | How Notified | DISPATCH | Time Arrived (24HR MM) | 1 5 0 1 | Report Date (MM/DD/YYYY) | 08/06/2015 |
|---|---|---|---|---|---|---|---|

| Invest. Comp. | Yes No | Investigator's Name (Pr. first) | ISRAEL GARCIA | | ID Num | AP6645 |
|---|---|---|---|---|---|---|

| ORI Num | TX2270100 | Agency | AUSTIN POLICE DEPARTMENT | Service Region/DA | HENRY |
|---|---|---|---|---|---|